**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**QUALITY MARKETS, INC., Respondent.**

**No. 16579.**

United States Court of Appeals Third Circuit.

Argued Oct. 6, 1967.

Decided Dec. 18, 1967.

Robert Giannasi, Atty., N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., National Labor Relations Board, on the brief), for petitioner.

Raymond A. Anderson, Johnson, Peterson, Tener & Anderson, Jamestown, N. Y., for respondent.

Before STALEY, Chief Judge, and MARIS and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

STALEY, Chief Judge.

This is a petition by the National Labor Relations Board for enforcement of its order requiring, inter alia, Quality Markets, Inc. (hereinafter "Quality"), to bargain with Amalgamated Meat Cutters and Butcher Workmen of North America, Amalgamated Food Employees Local Union 590, AFL–CIO (hereinafter "Union"). The issues before us are whether the Board had a substantial basis to conclude, contrary to the trial examiner, that the Union represented a majority of unit employees at the time it demanded recognition as bargaining agent, and whether we should enforce the Board's bargaining order.

Quality operates 38 retail food stores in New York and Pennsylvania. In June, 1963, the Union engaged in a campaign to organize the employees of Quality's four stores in Titusville, Pennsylvania. The Union succeeded in obtaining the signatures of thirteen employees to cards which constituted an application for membership and an authorization for the Union to bargain with Quality on the signer's behalf. On the morning of July 1, 1965, the Union presented the thirteen cards to the officers of the company and requested that Quality bargain with the Union as majority representative.

The company had been aware of the Union's campaign virtually from its outset, and had countered with a vigorous effort designed to explain the "company's side." When presented with the authorization cards, Quality's president stated "Well this appears that you have a majority" but he continued that they had had "experience with unions" and

would like to go through a normal Board election. The vice president also leafed through the cards, calling off the names, and he noted that one of the signers was about to retire, or had done so already, and that another had been known to have requested that her card be returned to her. The meeting adjourned on this note, with the Union agreeing to call back one week later for Quality's decision. However, Quality later sent a telegram to the Union refusing to bargain before the Union's majority status was determined by a representation election.

Pursuant to the Union's charges, the Board's regional director issued a complaint that Quality violated § 8(a) (1) and § 8(a) (5) through coercive tactics and its refusal to bargain. After a full hearing, the trial examiner found that Quality had violated § 8(a) (1) but recommended the dismissal of the § 8(a) (5) charges.

The trial examiner found that Quality's four Titusville stores constituted an appropriate bargaining unit and that the unit consisted of 22 full and part-time employees. However, the trial examiner refused to count the cards signed by three employees: one signer had retired before July 1st, another signer was a supervisor, and the third, Miss Vera Vergith, had sought the return of her card on June 23rd "strictly on her own initiative." Since these findings left the Union with less than a majority of unit employees, the trial examiner concluded that Quality had no duty to bargain with the Union on July 1st, and could not be held to have violated § 8 (a) (5). Moreover, he concluded that since the company knew that one signer was retired and another had revoked her authorization to the Union, even if the Union represented a majority on July 1st, its refusal to bargain was in good faith. The examiner did find that Qual-

ity's conduct throughout the Union's campaign violated § 8(a) (1), citing numerous instances of interrogation, threats, promises of benefit and encouragement to withdraw from the Union.

On appeal, the Board reversed that part of the trial examiner's decision relating to Quality's refusal to bargain.[1] First, the Board disagreed with the examiner's conclusion that one of the part-time employees should be included in the unit. Second, the Board found that since Miss Vergith's revocation of authorization was the product of Quality's § 8(a) (1) violations, the revocation should not be considered valid and the card should be counted toward the Union majority. Thus the Board found that on July 1st, the Union represented 11 of 21 employees. Finally, the Board concluded that in view of Quality's extensive unfair labor practices, the failure to accord recognition to the Union was not in good faith, and the Board ordered Quality to bargain with the Union. We will affirm the Board.

■ The Board's finding that the part-time employee should not be included in the bargaining unit was clearly within the Board's discretion, and did not rest on any difference with the trial examiner as to the credibility of the witnesses. The trial examiner found this employee a member of the unit because he was regularly employed for two hours on Wednesday morning to unload a delivery truck. Relying on the same evidence as the trial examiner, the Board excluded the employee because it concluded that he did not have the "requisite community of interest" with the other unit employees. While other part-time employees were included in the unit, this employee, a high school student, worked entirely outside the store, and put in less than half the hours of the other part-

---

1. Quality did not except to the trial examiner's findings, but urged that his decision be adopted. Thus we are foreclosed from considering any possible objection Quality might have to the trial examiner's findings and conclusions by §

10(e) of the Act, 29 U.S.C. § 160(e). Marshall Field & Co. v. NLRB, 318 U.S. 253, 255–256, 63 S.Ct. 585, 87 L.Ed. 744 (1943); NLRB v. International Union of Operating Eng'rs, 357 F.2d 841 (C.A.3, 1966).

timers. On these facts, the Board could reasonably conclude, contrary to the trial examiner, that the employee's likely interest in the working conditions and terms of employment of the other unit employees would be minimal. NLRB v. Greenfield Components Corp., 317 F.2d 85, 89 (C.A.1, 1963).

We also find that the Board could reasonably conclude that Miss Vergith's authorization card should be counted for the Union. The record credited by the trial examiner shows that on June 23, one day after Miss Vergith signed an authorization card, she called the Union organizer who had talked with her and requested the return of her card. The organizer stated he could not return the card because it had been forwarded to the Union's international representative. No attempt was made after this time to return the card to Miss Vergith, nor did she make subsequent requests for it. The trial examiner credited Miss Vergith's testimony that no management official had ever discussed the Union with her,[2] and he found that since she had sought to retrieve her card on her own initiative, the card could not be included among those used to determine the Union's majority status on July 1. Thus he concluded that her action constituted a valid revocation of her authorization of representation.

[redacted] The Board noted that about the time Miss Vergith first signed and then sought to retrieve her card, Quality was engaging in various unfair labor practices by interrogating individual employees, threatening some workers and making promises of benefits to others. While there was no evidence that anyone from management engaged in such conduct in Miss Vergith's presence, she could not have been unaware of the company's conduct and attitude; she testified that the matter of signing cards and having the Union was discussed among the employees at the store in which she worked. The Board reasonably concluded that Miss Vergith's revocation of her authorization card was the product of these contemporaneous unfair labor practices, and should not be given effect.

[redacted] We thus agree with the Board that on July 1st, the Union represented a majority of unit employees. However, this fact alone would not support the Board's finding of a § 8(a) (5) violation. Normally, an employer is entitled to insist on a representation election before extending recognition to a union, although status as exclusive representative may be established by other means. United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 71–72, 76 S.Ct. 559, 100 L.Ed. 941 (1956). Where, as here, a union's demand for recognition is supported by authorization cards signed by unit employees, an employer may still insist on an election if he has a "good faith doubt" that the union actually commands the purported majority. NLRB v. Frank C. Varney Co., 359 F.2d 774, 775–776 (C.A. 3, 1966); Allegheny Pepsi-Cola Bottling Co. v. NLRB, 312 F.2d 529, 532 (C.A. 3, 1962). Precisely what conduct the Board will consider as evidencing "good faith doubt" is not clear, compare Snow v. NLRB, 134 N.L.R.B. 709 (1961), enforced 308 F.2d 687 (C.A.9, 1962), with Aaron Bros., 158 N.L.R.B. No. 108 (1966). However, in view of the fact that authorization cards are "a notoriously unreliable method of determining majority status of a union," Sunbeam Corp., 99 N.L.R.B. 546, 550–551 (1952), we should be prepared to sanction refusals to bargain on the basis of authorization cards where there is no indication that the employer's rejection was based on a desire to illegally subvert the union's majority, but rather on the basis of a sincere doubt that the union actually represents a majority. Of course, the determination of the employ-

2. This is not necessarily inconsistent with Quality's knowledge that Miss Vergith had requested the return of her card at the time of the meeting between the Union and the Quality officers on July 1st.

er's bona fides presents a factual inquiry:

"* * * Whether an employer is acting in good or bad faith in questioning the union's majority is a determination which of necessity must be made in the light of all the relevant facts of the case, including any unlawful conduct of the employer, the sequence of events, and the time lapse between the refusal and the unlawful conduct. Where a company has engaged in substantial unfair labor practices calculated to dissipate union support, the Board, with the Court's approval, has concluded that employer insistence on an election was not motivated by a good-faith doubt of the union's majority, but rather by a rejection of the collective-bargaining principle or by a desire to gain time within which to undermine the union. However, this does not mean that any employer conduct found violative of Section 8(a) (1) of the Act, regardless of its nature or gravity, will necessarily support a refusal-to-bargain finding." Aaron Bros., 158 N.L.R.B. No. 108 (1966).

In this case, the Board relied upon the numerous § 8(a) (1) violations committed by Quality to support its conclusion "that the Respondent's failure to accord recognition to the Union was not in good faith, but rather was born of a desire to gain time to subvert the Union's majority and to thwart unionization and therefore violated Section 8(a) (5)."

The trial examiner's conclusion that Quality's refusal to bargain did not violate § 8(a) (5) was based on two factors: (1) the Union did not represent a majority of employees on the date it de-

manded recognition, and (2) the company's refusal to bargain was in good faith because it reasonably doubted the Union's majority, knowing that one of the signers had retired and another had sought to retrieve her card.[3] We have already agreed with the Board's rejection of the trial examiner's first ground because we affirm the Board's finding that on July 1, 1965, the Union did represent a majority of unit employees.

The second ground falls with the first. We have affirmed the Board's conclusion that Miss Vergith's revocation of authorization was the product of Quality's § 8(a) (1) violations. We cannot turn around and support a finding of good faith doubt where such doubt was based on the company's knowledge that its illegal tactics had been at least partially successful.

Moreover, the company's conceded § 8(a) (1) violations about the time of the Union's demand for bargaining, and thereafter, negate the conclusion that the company's refusal to bargain was based on a belief that a majority of employees did not want the Union. The company did not question the authenticity of the cards, but it did intensify its efforts to dissuade individual signers.[4] Thus, the company sought out the individuals who signed cards and interrogated them, threatened some with dismissal or reprisal for supporting the Union, promised that wage and fringe benefits were forthcoming from the company and granted them immediately after the Union's request for recognition, and suggested the means by which individuals might withdraw from the Union. The only inference to be drawn from the record is that the company did not doubt

3. Of course, Quality cannot base a refusal to bargain on the basis of doubts about the appropriateness of the unit requested by the Union, for it is the Board's duty to determine the appropriateness of the unit requested. E. g., NLRB v. Keystone Floors, Inc., 306 F.2d 560, 563-564 (C.A. 3, 1962).

4. There is no suggestion that the Union overreached employees or misrepresented

the import of signing the authorization cards, NLRB v. River Togs, Inc. 382 F. 2d 198 (C.A.2, 1967); nor that the employees signed the cards merely to bring about an election, see NLRB v. Gotham Shoe Mfg. Co., 359 F.2d 684 (C.A.2, 1966); NLRB v. S. E. Nichols Co., 380 F.2d 438 (C.A.2, 1967); Crawford Mfg. Co. v. NLRB, 386 F.2d 367 (C.A.4, 1967).

the genuineness of the authorizations, but sought to coerce or cajole a re-nunication of the Union before the anticipated election.

On this record we must agree with the Board's finding that Quality violated § 8(a) (5), and we will enforce the Board's mandatory bargaining order. Although there are cases where we would not support such an order, cf., River Togs, supra, the Board drew a permissible inference from the record that to hold an election would not afford satisfactory relief, and the bargaining order is a reasonable exercise of the Board's remedial power.

An appropriate order may be submitted by the Board.