NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SOUTHLAND PAINT COMPANY, Inc.,
Respondent.

No. 24275.

United States Court of Appeals
Fifth Circuit.

May 8, 1968.

Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Gary Green, Atty., NLRB, Washington, D. C., Chris Dixie, Houston, Tex. (Intervenor), John R. Tadlock, Denver, Colo. (Intervenor), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., for petitioner.

J. D. McLaughlin, Paris, Tex., Fisher, McLaughlin & Harrison, Paris, Tex., for respondent.

Before BROWN, Chief Judge, WISDOM and THORNBERRY, Circuit Judges.

WISDOM, Circuit Judge:

The National Labor Relations Board seeks enforcement of orders based on findings that the respondent, Southland Paint Company, Inc., violated sections 8(a) (1), 8(a) (3), and 8(a) (5) of the National Labor Relations Act, 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq. The case is a run of the mine case as to the 8(a) (1) and 8(a) (3) charges. The 8(a) (5) charge, however, rests on the Board's finding that Southland refused to bargain collectively with the Oil, Chemical and Atomic Workers International Union, AFL-CIO, representing a majority of its employees *as evidenced by signed authorization cards.* 156 NLRB 22; 157 NLRB 795. We enforce the orders as to the 8(a) (1) and 8(a) (3) violations. We decline to enforce the mandatory bargaining order, because we hold that substantial evidence does not support the Board's finding, *based on the authorization cards,* that the Union represented a majority of the employees at the time that the demand for bargaining was made.

### I. The 8(a) (1) Violations.

A. The campaign by the Union to organize the production and maintenance employees of the Southland Paint Company of Gainesville, Texas, began early in 1964. The Company first learned of the campaign on February 28, when one of the employees told a supervisor that a union meeting was to be held that night. A few days later the Union sent a telegram to the Company announcing that the drive was underway, and that some of the employees were participating. The Company acted promptly to counteract the Union effort. Officials or pro-company employees took a list of license plate numbers at the site of the February 28 meeting, and tele-

phoned the home of employees to determine if they were at the meeting. The next day, officers asked one of the employees, Thurman, to attend future meetings, to report to the Company, and to oppose the Union. He was offered a raise in salary in return for his help; he declined to help. March 2, the Company suspended plant operations and assembled the employees to hear an anti-union speech by the Chairman of the Board of Directors of the Company, R. A. Davis, Sr.[1] He threatened to close all or part of the plant and to reduce wages if the Union succeeded in its drive. That same day, the President established a Grievance Committee, the first time such a committee had been formed in the plant. A week later, the Company announced a general pay increase and a vacation plan for employees with five years of seniority.

During the weeks that followed, while the campaign continued, the Company made many attempts to stop the Union drive. The Company conducted surveillance of the union meetings through license plate checks and created an impression that it had an informer present at the meetings. Management personnel approached employees and interrogated them about their views and activities regarding the Union. The Company made general threats to close the plant if the Union came in, offered promotions and pay increases in return for opposition to the Union, and threatened reprisals against employees who supported the Union.

■ No good purpose would be served by reviewing in detail the Board's findings as to the 8(a) (1) violation. On the record, as a whole, substantial evidence supports the conclusion of the Board that the conduct of the Company

was an unfair labor practice by the terms of section 8(a) (1). See NLRB v. Camco, Inc., 5 Cir. 1965, 340 F.2d 803, cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed 2d 339.

B. The Board found that the Company also violated section 8(a) (1) by demoting John R. Smith from foreman to a rank-and-file member of the shipping crew.[2] Prior to his demotion Smith was a supervisor. Discrimination against him would not come within the terms of section 8(a) (3). Smith, however, had been an active supporter of the Union, had signed a union card himself, and had solicited others for the Union. The Company issued a directive that supervisory personnel were not to participate in the Union activity, and apparently, Smith abided with this regulation after it was made. At the first hearing held by the Board on the present charges, Smith gave testimony damaging to the Company. At a later date he gave an affidavit supporting the Board's opposition to a continuance sought by the Company of a second hearing. As a result, according to his testimony, Davis, Sr. called him to account. Twelve days later, the Company demoted Smith and cut his wages. The Board discredited testimony of Company officials that Smith was demoted for cause, found that the demotion was a reprisal, and ordered that Smith be reinstated in his previous position.

■ The act offers no protection to supervisory personnel who are disciplined or discriminated against because of their support of a union. But it does protect them from discrimination premised on their having given testimony before the Board. In Oil City Brass Works v. NLRB, 5 Cir. 1966, 357 F.2d 466, 471, this Court held that among

1. Davis, Sr., the founder of the Company, was strongly antiunion and was responsible for many of the unlawful acts charged to the Company. He became ill late in 1964, and died May 30, 1965, shortly after the hearings on the violations were held. R. A. Davis, Jr., his son, was the president of the Company.

2. On the ground that the remedy would be the same, the Board declined to consider whether the conduct of the Company in this regard would also be a violation of § 8(a) (4).

the rights protected from management interference is the right to have the privileges secured by the Act vindicated through the administrative procedures of the Board, and that "any discrimination against supervisory personnel because of testimony before the Board directly infringes the right of rank-and-file employees to a congressionally provided, effective administrative process, in violation of section 8(a) (1), 29 U.S.C. § 158(a) (1)". See NLRB v. Better Monkey Grip Co., 115 N.L.R.B. 1170, enfd., 243 F.2d 836 (5 Cir. 1957), cert. den., 355 U.S. 864, 78 S.Ct. 96, 2 L.Ed.2d 69 (1957); NLRB v. Dal-Tex Optical Co., 310 F.2d 58 (5 Cir. 1962). The giving of an affidavit in the course of a Board proceeding is equivalent to giving testimony.

Smith's case raises a close factual issue.[3] However, the Board had before it sufficient evidence from which it could infer that Smith's demotion was a violation of section 8(a) (1). We enforce the portion of the Board's order requiring the Company to offer Smith reinstatement to his former position or to one substantially equivalent, with back pay and restoration of seniority or other rights which he may have lost as a result of the discriminatory conduct.

## II. The 8(a) (3) Violations.

We hold that substantial evidence supports the Board's findings that Southland discriminatorily discharged three employees, suspended one, and refused to rehire a fifth.[4] Two of the dis-

3. The Company asserts that the decision to replace Smith was made by a supervisor who had no knowledge of Smith's affidavit, and makes a telling point when it suggests that it would not be logical for the Company to take a union supporter from a position where his support could not help, and could perhaps hurt the Union, and place him among the rank-and-file, where his support could be highly significant.

4. *Cleamon E. Smith.* Smith, a laboratory technician and valued employee maintained a regular check on the quality of the paint produced. The Company contends that Smith was a supervisor, and therefore not protected by § 8(a) (3). Although he held a position of importance, he had no authority over other employees, such as the power to hire, discipline, transfer, assign, etc. On this evidence, the Board found that he was not a supervisor within the meaning of § 2(11) of the Act. Early in the union campaign Smith signed a union authorization card. He was offered a promotion and a raise in return for opposing the Union, and threatened with reprisals. He was also asked to testify for the Company after the Board hearing was scheduled. He replied that he would rather not testify at all, but if he did, his testimony would probably hurt the Company. Shortly after, on August 1 and again on August 6, he was offered a plant supervisor's position in return for his support, and again he refused. August 10 he was discharged. November 9, after charges had

been filed, he was rehired. The Company asserts that Smith was discharged because of (1) a general attitude detrimental to the Company, (2) his refusal to talk to Davis, Sr., at the latter's request, and (3) incidents growing out of a fight he had with another employee. The Board was entitled to find, as it did, that the reasons advanced by the Company were a "pretext to mask the real motivating cause—his refusal to oppose the Union."

*A. C. Holder.* Holder had worked for the Company since April 1962. He signed a union card on February 28. Holder had at one time been convicted of armed robbery, and the Company was well aware of this. March 16, he was summoned to the office of Davis, Sr., and told that he should forget about the Union, as the Company could fire him at any time, and because of his criminal record, the Union could not protect him. May 15, his foreman handed him an envelope containing two pay checks, and told him that on the instructions of Davis, Sr., he was being discharged. At this time no reason for the discharge was given. June 9, he was asked to come to the office of Davis, Sr., where he was told that his discharge was a result of a mistaken belief of the nature of his criminal record, and that having learned the truth, he was invited to return. The next day, he resumed his old position. The Company asserts that Davis, Sr., had mistakenly learned that Holder's criminal record included a conviction for the offense of child fondling,

chargees were rehired, as was the applicant for reemployment. We disagree in one minor respect, with regard to George E. Brown. It is not disputed that the

and that he was unwilling to have a person with such a record working for the Company. When he later learned that this information was false, Holder was rehired. However, no explanation was given as to why Holder was not informed of the reason for his discharge until he was offered reinstatement, or why the matter of his criminal record, well known to the Company, suddenly became an issue during the union campaign.

*Kenneth J. Thurman.* Thurman had worked for the Company since August 1963, had received several pay raises and had frequently been complimented on his work. He had attended the first Union meeting on February 28 and signed a union card. The Company had attempted to use him as an informer. Several times throughout the succeeding months, he was asked to oppose the Union and threatened with reprisals if he refused. When the Board hearing was scheduled, he was asked to testify on behalf of the Company and refused. December 18, he was handed a letter stating that he had committed a number of errors in preparing shipments, that he had called a supervisor a "smart s. o. b." while being reprimanded for one such incident, and that there was a necessity to cut back on personnel because of the loss of a government contract. He was then discharged. The Board found that in view of the previous incidents, the reasons given were a mere pretext for the real reason, his support of the Union, and refusal to cooperate with the Company's efforts to oppose it. By his testimony, credited by the examiner, he was told shortly after by his supervisor that his position on the Union was the actual reason for his discharge. The Company's position has been inconsistent: It has attempted to place principal reliance on the name-calling incident. The Board acknowledged that while use of intemperate language to a supervisor was usually a sufficient ground for the discharge of an employee cf. N. L. R. B. v. Blue Bell, Inc., 5 Cir. 1955, 219 F.2d 796; N. L. R. B. v. Soft Water Laundry, Inc., 5 Cir.1965, 346 F.2d 930, when considered in the context here presented, it was merely a masking device. The Board pointed particularly to the fact that Thurman was later told that his Union activity was the real cause, and that the Company had offered a number of other reasons to support its action in the discharge letter, inconsistent with the assertion that the name-calling was the grounds.

*Jim Pat Smith.* Smith had worked for the Company since October 1959, first as a warehouseman and later as a machine operator. He attended the Union meeting on February 28, and the next day was called into the office of Davis, Jr., and interrogated about the meeting. Several times in the succeeding months he was further reinterrogated. In July Davis, Sr. offered him a promotion to a position of manager if he would notify the Board that he was abandoning the Union. He refused this offer. On September 4, another employee called him at home, and, stating that he was ill and would not be to work on time, asked Smith to punch his time card. When he arrived at work, Smith did so, but immediately advised his supervisor of the fact and was told by him that it was "all right". Two weeks later, he was given a one week suspension, allegedly because of the fact that he had violated a company rule by punching another employee's time card. The Board found that others who had committed the same act had merely been reprimanded, that Smith had immediately notified his supervisor, thus obviating any adverse effect, and that the Company waited two weeks before taking action. The Board concluded that the card punching incident was merely a pretext for the anti-union motivation. As the inference of an invalid motivating cause was proper, on this record, the existence of a valid motivating cause would not affect our duty to uphold the Board. N. L. R. B. v. Longhorn Transfer Service, 5 Cir.1965, 346 F.2d 1003, 1006; N. L. R. B. v. Linda Jo Shoe Co., 5 Cir.1962, 307 F.2d 355, 357.

*George E. Brown.* Brown had worked for the Company intermittently and in various positions since 1955, until he resigned in 1962. In September 1964, the Company acquired a government contract, and rehired Brown on a temporary basis. When the contract was fulfilled, the need for his work ceased. The Board found that he was legitimately discharged for economic reasons on January 18, 1965. Brown had signed a union card on January 10. Shortly after, several new positions opened at the plant. On February 3, Brown wrote to the Company requesting reinstatement. One man was hired on February 4, and two more on February 8 for work similar to that which Brown had been doing. Brown wrote again on February 27, stating that he had heard

lay-off of January 18 was legitimate. Brown first sought reinstatement by a letter mailed on February 3. On February 4, when the first man was hired, the Company could not have known of Brown's desire to be reinstated. The Board's order, however, requires the payment of back pay from that day until the day Brown was actually rehired. We modify the Board's order to the extent that we require back pay to be paid Brown only from February 8, at which time two more men were hired, and by which time it is proper to infer that the refusal to rehire Brown was discriminatory.

### III. The 8(a) (5) Violations.

The Union representatives, assisted by certain employees of the Company, sought to have the production and maintenance employees sign cards authorizing the Union to act as their bargaining agent.[5] At the first union meeting on February 28, and on several other occasions a number of employees signed such cards. March 24, the Union organizer wrote to Southland stating that the Union represented a majority of the employees in a unit of production and maintenance workers. The Union offered to prove its majority status through a third party, and demanded that the Company recognize and bargain with it. The Company did not reply to this letter and has refused to recognize the Union.

The Board found that on March 24 the appropriate unit consisted of 34 employees, that the Union held valid authorization cards from 20 of these employees, that the Company had no good faith doubt of the majority status, and that therefore the refusal to recognize and bargain with the Union was a violation of section 8(a) (5). Based on this finding, the Board issued an order re-

---

that several men had been hired since he left, and on March 8 he visited the plant, *again in an attempt to gain employment.* At this time he was told that he had been hired only on a temporary basis, and that it was against Company policy to hire relatives of employees on a permanent basis. (Brown's father also worked for the Company.) Davis, Sr. told him that although he had been a good worker, he had signed with the Union, and that if he had not, he might still be working there. On March 20, a supervisor wrote to Brown offering him a position, and on March 24 he was rehired as a "new" employee. The Board found that the Company's failure to rehire Brown was caused by his having signed a Union card. In the context of this record, the fact that several others were hired during February, and that the excuses given for not hiring Brown, his work record and the anti-nepotism policy, are inconsistent with the fact that he was rehired at the request of the Company a short time later, *the Board's finding is well supported.*

---

5. The cards used read as follows:
 THE LAW OF THE UNITED STATES PROVIDES THAT:
 Workers have the right to designate a union to represent them for the purpose of collective bargaining with their employer.

 AUTHORIZATION

 Name ..................................................
 Address ..................................... City ..............
 Employer ...............................................
 Area ............... Shift ............... Classification ..............
 I hereby designate and authorize the Oil, Chemical and Atomic Workers International Union, AFL–CIO, as my collective bargaining agent in all matters pertaining to wages, rates of pay and conditions of work.

 Date ............................. ..........................
 Signature

 Witness .......................... ..........................

 CONFIDENTIAL: Neither your employer nor his representative will ever see this signed authorization.

quiring the Company, upon request to bargain with the Union.[6]

A union elected by 20 employees in a unit of 34 acts as the "exclusive representative" of *all* 34 employees. No wonder the Act, in terms (section 9(c)), provides for the selection of a union as bargaining representative by regulated secret ballot. In keeping with the importance of the election, the Board takes great care to prevent management or labor from coercing the employees. Indeed, the Board has prided itself on its providing "laboratory conditions" in regulating elections, so as "to determine the uninhibited desires of the employees". General Shoe Corp., 77 N.L.R.B. 124, 127 (1948).

■ Section 8(a) (5), however, states that "it shall be an unfair labor practice for an employer * * * to refuse to bargain collectively with the representatives of his employees". This language has been interpreted to mean that an employer is under a duty to bargain as soon as the union representative presents convincing evidence of majority support. NLRB v. Dahlstrom Metallic Door Co., 2 Cir. 1940, 112 F.2d 756. Notwithstanding Section 9(c), such evidence may consist of employees' signatures on cards authorizing the union in question to act as their bargaining agent—without an election. Franks Bros. Co. v. NLRB, 1944, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020. In *Franks Bros.* the union had obtained signed cards from 45 of 80 eligible employees authorizing it to act as bargaining representative, and demanded recognition or an election. The company conducted an aggressive antiunion campaign, as a result of which the

support for the union eroded. The union withdrew its election petition, alleging that a fair election was impossible. The Board held that the company was obligated to bargain when the cards were presented, and issued an order requiring it to do so. The Supreme Court upheld the Board, stating that as long as a majority had supported and authorized the union at the time the demand was made, it was appropriate for the Board to order bargaining, by virtue of its authority under section 10(c), authorizing the Board to fashion appropriate remedies to correct unfair labor practices.

■ A leading case in this area is Joy Silk Mills, Inc. v. NLRB, 1950, 87 U.S. App.D.C. 360, 185 F.2d 732, cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350. In *Joy Silk* the Court held that when an employer could have no doubt as to the majority status or when an employer refuses recognition of a union "due to a desire to gain time and to take action to dissipate the union's majority, the refusal is no longer justifiable and constitutes a violation of the duty to bargain set forth in section 8(a) (5) of the Act". On this point, *Joy Silk* has been universally followed;[7] of course, first it must be shown that majority support did in fact exist.[8]

■ Although the decision in *Joy Silk* turned on the employer's motivation, "good faith doubt", the case is perhaps most often cited on another point. The employer in *Joy Silk* had questioned the employees as to their purpose in signing the cards. In upholding the Board's finding that this interrogation was a violation of section 8(a) (1), the court said

"an employee's thoughts (or afterthoughts) as to why he signed a union

6. In a subsequent order, also under review here, the Board found that the promulgation of work rules on January 27, 1965, was a violation of its obligation to bargain with the union in regard to conditions of employment, and ordered that the rules be rescinded. Since this finding rests on the holding that the Company was obligated to bargain, a conclusion with which we do not agree, the portion of the order regarding the work rules will also not be enforced.

7. See, e. g., NLRB v. Stewart, 5 Cir. 1953, 207 F.2d 8; NLRB v. Decker, 8 Cir.1961, 296 F.2d 338; and other cases cited in 75 Yale L.J. at 811 no. 50.

8. NLRB v. Koehler, 7 Cir.1964, 328 F.2d 770; NLRB v. Peterson Bros., Inc., 5 Cir. 1965, 342 F.2d 221. Cf. International Ladies' Garment Workers, etc. v. NLRB, 1961, 366 U.S. 731, 81 S.Ct. 1603, 6 L. Ed.2d 762.

card, and what he thought the card meant, cannot negative the overt act of having signed a card designating a union as bargaining agent." 185 F.2d at 743.

No issue was raised in *Joy Silk* as to the validity of the cards or of misrepresentation by the union representatives who solicited them. Nevertheless, the Board has often quoted and relied on this *Joy Silk* dictum, as it did in this case, to make the act of signing an authorization card decisive—regardless of the employee's understanding of what he was signing and what he was told about the purpose of the card. This Court has never applied the dictum so woodenly. And courts of appeals in other circuits which have recently considered the point, with the exception of the District of Columbia Circuit, are in general accord with our view: the *Joy Silk* rationale is sound only if the employees understand that if a majority sign cards designating the union as their bargaining agent an election will be unnecessary.

"Laboratory conditions" are conspicuous by their absence in many cases involving selection of a bargaining representative by the use of authorization cards. The Board itself has said that this is "a notoriously unreliable method of determining majority status of a union". Sunbeam Corporation, 99 N.L.R.B. 546, 550–551 (1952). Commentators are less restrained.[9]

The Board's current rule, sought to be applied here, is that an authorization card may not be questioned, unless there is clear and convincing evidence of misrepresentation or coercion. As a general principle, this rule would not be objectionable were it not that with regard to elections, the Board takes the position that the solicitation is not misleading unless the union solicitor represents that the cards are *solely* for the purpose of holding an election. The Board has not always had the strict rule it now applies.

**9.** See particularly Comment, Union Authorization Cards, 75 Yale L.J. 805 (1966). For example: The "Board, under certain circumstances, has allowed unions to circumvent regulated secret ballot elections by permitting them to attain exclusive representational status on the basis of authorization cards secured from a majority of the employees. * * * Designation by cards rests upon a strained reading of the National Labor Relations Act. And beyond the question of interpretation, the Board has failed to evaluate fairly the card procedure with reference to important policy considerations." 75 Yale L.J. at 806. See also Lewis, The Use and Abuse of Authorization Cards in Determining Union Majority, 16 Lab.L.J. 434 (1965); Comment, Refusal-to-Recognize Charges Under Section 8(a) (5) of the NLRA: Card checks and Employee Free Choice, 33 U. Chi.L.Rev. 387 (1966). For a restrained view critical of the Board for having been "needlessly rigid in its extreme reluctance to police union practices involving the collection of authorization cards", see Lesnick, Establishment of Bargaining Rights Without an NLRB Election, 65 Mich.L.Rev. 851, 856 (1967).

Professor Howard Lesnick suggests that "fashions come and go in the subjects of NLRB litigation" and that "the wave of the present * * * is the question of establishment of bargaining rights without an election." He notes that "there were * * * about a dozen such cases in 1964, twice that many the following year, and approximately 117 in 1966". 65 Mich.L.Rev. at 851.

The increase in these cases may be a result, in part, of the Board's decision in Bernel Foam Prods. Co., 147 N.L.R.B. 1277 (1964). In Aiello Dairy Farms, 110 N.L.R.B. 1365 (1954), the Board held that a union which sought and was given an election could not also rely on the refusal of the employer to bargain on the basis of authorization cards; the union must elect its remedies. *Bernel Foam* overruled *Aiello:* The Board held that if a motion to set aside the election is made and found meritorious, the union may go forward with the 8(a) (5) charge based on the authorization card majority. Many of the recent cases have involved unions making such a choice, perhaps believing that they no longer had a chance to win an election because of the employer conduct. In the instant case, no election was sought or held, and the union relies on the cards only to establish its majority. It may be noted that the demand for recognition here was made before the *Bernel Foam* decision.

In Englewood Lumber Co. 130 N.L.R.B. 394 (1961) the Board held that when union organizers told employees that the cards were for an election by secret ballot, such cards should not be counted in determining in a union's majority status. See also Morris & Associates, Inc., 138 N.L.R.B. No. 126 (1962). But under Cumberland Shoe, 144 N.L.R.B. 1268 (1963), enforced, 6 Cir. 1965, 351 F.2d 917, the Board laid down the rule that there is but one misrepresentation as to the purpose of the card: a statement by the solicitor that the *only* purpose of the card is to obtain an election. The Board accepts cards stating in bold type "I want an NLRB election now", signed on the representation that the cards are to obtain an. election. S.N.C. Manufacturing Co., Inc., 147 N.L.R.B. 92 (1964).[10]

The central concern in determining whether a union is a qualified agent to bargain for its members is—employee free choice. It is not the right of the union to solicit support, or of the employer to bargain or not, or of the Board to uphold its authority to fashion remedies. Section 7 of the NLRA gives employees the right to "bargain collectively through representatives *of their own choosing* * * * or * * * to refrain from * * * such activities." (Emphasis added.) This right is lost when a minority of the employees are able to authorize the union to bargain for all of the employees. Lost too is the right guaranteed by section 9 that exclusive bargaining status shall be granted to "representatives designated or selected * * * by a majority of the employees" in an appropriate unit.

This Court scrutinizes authorization cards as a means of achieving representational status. See NLRB v. Dan River

Mills, Inc., 5 Cir. 1960, 274 F.2d 381. In NLRB v. Peterson Bros., Inc., 5 Cir. 1965, 342 F.2d 221, the union claimed majority status on the basis of authorization cards which designated the union as bargaining representative and also stated: "This card is for use in support of the demand by this Union for recognition from the Company in your behalf, or for an NLRB election." The Board concluded that three disputed cards were valid since the signers were not told that the *only* purpose of the cards was to obtain an election. "If the cards are to be voided on the ground that the employees were misled into believing the cards would be used for a different or more limited purpose, this must be done on the basis of what the employees were told, not on the basis of their subjective state of mind when they signed the cards." 144 N.L.R.B. at p. 682. We held that the cards were ambiguous in that they served a dual purpose—authorization for representation and authorization for an election. The Court, speaking through Judge Tuttle, said:

> "[T]here was a burden on the General Counsel to establish by a preponderance of the evidence that the signer of the card did, in effect, what he would have done by voting for the union in a Board election. We think that in refusing to consider the subjective intent of the signer of the card, in light of the ambiguity on the face of the card, the Board erred." 342 F.2d at 224.

The Court denied enforcement of the bargaining order.[11]

In Engineers and Fabricators, Inc. v. NLRB, 5 Cir. 1967, 376 F.2d 482 the authorization cards in question clearly stated that the signer requested and accepted membership in the union and authorized

---

10. The use of such cards to support a bargaining order would be contrary to our decision in NLRB v. Peterson Bros., Inc., 5 Cir. 1965, 342 F.2d 221, absent an inquiry into the subjective intent of the signer.

Commenting on S.N.C. Manufacturing Co., Professor Lesnick declared: "There seems to me little justification for failing

to say squarely that, to establish majority status, such a card may not be used at all; the loss to the union is minimal, and the safeguard against misunderstanding and misrepresentation is substantial." 65 Mich.L.Rev. at 856–57.

11. Contra, NLRB v. C. J. Glasgow Co., 7 Cir.1966, 356 F.2d 476, where the cards were similar.

it as his bargaining agent; there was no reference to an election on the cards. There was however, evidence that the cards were solicited on the representation that they were to be used to obtain an election. The Board, applying the *Cumberland Shoe* doctrine held that since the employees were not told that an election was the *only* purpose of the cards, the challenged cards should be counted. The Court expressly rejected this standard. Speaking through Judge Coleman, we held:

> "When cards are challenged because of alleged misrepresentations in their procurement, the general counsel must show that the subjective intent to authorize union representation was not vitiated by such representations * *. [T]oo lax a standard [was used] and therefore the burden was not met. The point is that the Board applied the facts to the wrong legal standard because there was no probing into the subjective intent of the challenged signers." 376 F.2d at 487.

The Court quoted with approvel from Bauer Welding and Metal Fabricators, Inc. v. NLRB, 8 Cir. 1966, 358 F.2d 766; NLRB v. Koehler, 7 Cir. 1964, 328 F.2d 770, and Englewood Lumber Co., 130 N.L.R.B. 394 (1961).

In NLRB v. Lake Butler Apparel Co., 5 Cir. 1968, 392 F.2d 76 (March 25, 1968) as in *Engineers*, the cards used were clear, at least to the extent that the cards did not mention an election and did contain the signer's acceptance of membership in the union. The Court made it clear that "once representation cards are challenged as here because of misrepresentation in their procurement and proof is offered which substantiates the challenge" the burden of proof is on the general counsel "to show that the subjective intent to authorize union representation was not vitiated by the misrepresentation." Judge Bell, speaking for the Court, noted the weakness in the Board's *Cumberland* approach:

> The facts of this case would seem to point to fault in the *Cumberland Shoe* rule. While it does simplify the problem of proof and receives credence from parol evidence rule concepts, there are countervailing policy considerations. The rights involved are those of the employees. The right is to join or not to join a union. The right is to be exercised free from coercion from any quarter. This can be insured by the use of the secret ballot and by laboratory conditions which the Board so wisely requires. * * * The right of employees to a choice and a choice through the secret ballot should not be lightly disregarded. A rule of convenience such as that formulated in *Cumberland Shoe* must give way to truth based on the record considered as a whole. Anything less disparages the rights accorded employees under § 7 of the Act and may visit the sins of the employer on the employees. The struggle is between the employer and the union but the right to select is that of the employees. 392 F.2d at 82.

■ The Second Circuit also scrutinizes the use of authorization cards. In NLRB v. S. E. Nichols Co., 2 Cir. 1967, 380 F.2d 438, the Board made much of the fact that the cards clearly authorized only representation, in contrast with misleading or ambiguous dual purpose cards. Judge Friendly pointed out that clarity, like beauty, is in the eyes of the beholder:

> "But while clarity should constitute the beginning of any effort to show a majority on the basis of authorization cards, it is not the end; the clearest written words can be perverted by oral misrepresentations, *especially to ordinary working people unversed in the 'witty diversities' of labor law*. It is all too easy for the Board or a reviewing court to fall into the error of thinking that language clear to them was equally clear to employees previously unexposed to labor relations matters; to treat authorization cards, which union organizers present for filling out and signing and then immediately take away, as if they were wills or contracts carefully explained by a lawyer to his client is to substitute form for reality.

* * * In our view the evidence demands a conclusion that at least three of the signers were induced to affix their signatures by statements causing them to believe that the union would not achieve representative status without an election." (380 F.2d at 442–443. (Emphasis added.)

The Court concluded that there was "an impairment of employees' § 7 rights" when an employee signs a card under the representation that he will be given an opportunity to make a formal choice only in an election and such card is used instead to designate a bargaining agent. 380 F.2d at 445. Judge Friendly noted that the cards, unlike those in *Engineers & Fabricators (but like the cards in the instant case)*, did not contain an acceptance of union membership, "one thing an employee could readily understand". Bearing in mind that "the function of authorization cards * * * is to demonstrate that a majority of the employees have 'clearly manifested an intention to designate the Union as their bargaining representative' [*Englewood Lumber Co.*] * * * there seems to be no reason why cards could not state in large type that if a majority signed, the union would claim representative status without an election". 380 F.2d at 442.[12] We agree.

The Sixth Circuit which approved the Board's Cumberland Shoe doctrine, NLRB v. Cumberland Shoe Corp., 6 Cir. 1965, 351 F.2d 917,[13] has recently reinterpreted its position. In NLRB v. Swan Super Cleaners, Inc., 6 Cir. 1967, 384 F.2d 609, the court denied enforcement of

a bargaining order because union solicitors had misrepresented the purpose of the cards. The court declined to consider evidence of a subjective intention not to join the union "as of controlling importance", citing *Joy Silk*. However, the court considered such evidence "relevant in assessing the effect of the solicitor's words, for it casts a telling reflection on *the actual communication conveyed to the signer*". Moreover, the "testimony of the signer as to his *expressed* state of mind is also relevant in determining whether his misapprehension over the purpose of the card was *knowingly induced* by the solicitor". (Emphasis in the original.) The Court explained *Cumberland*:

"[W]e do not consider that we have announced a rule that only where the solicitor of a card actually employs the specified words 'this card is for the *sole* and *only* purpose of having an election' will a card be invalidated. We did not intend such a narrow and mechanical rule. We believe that whatever the style or actual words of the solicitation, if it is clearly calculated to create in the mind of the one solicited a belief that the only purpose of the card is to obtain an election, an invalidation of such card does not offend our Cumberland rule."

The Court distinguished *Cumberland* on the ground that there the union did not seek an election.[14] Here, as to the four challenged cards:

"Considering the context of the solicitations, we find that their clear intent

12. See also NLRB v. River Togs, Inc., 2 Cir.1967, 382 F.2d 198 (enforcement of bargaining order denied on the basis of the employer's good faith doubt, noting also the fact that several employees who signed were illiterate in English and misrepresentations were made regarding the purpose of the cards) ; NLRB v. Golub Corp., 2 Cir. December 1, 1967, 388 F. 2d 921 (enforcement of bargaining order denied on the basis of misrepresentations, relying on Nichols) ; Bryant Chucking Grinder Co. v. NLRB, 2 Cir. December 12, 1967, 389 F.2d 565 (enforcement of bargaining order granted by a divided court, with three separate opin-

ions). And see the persuasive dissenting opinion of Judge Timbers in NLRB v. Gotham Shoe Mfg. Co., 2 Cir.1966, 359 F.2d 684, 687, strongly criticising the Cumberland Shoe Rule.

13. See also NLRB v. Winn-Dixie Stores, Inc., 6 Cir. 1965, 341 F.2d 750.

14. The court also distinguished *Cumberland* on the ground that the union there had also sought an election, as well as relying on the cards, while in *Swan*, the union "followed a now popular procedure of filing unfair labor practice charges against the company, having its claim of a bare majority sustained, and thus obtain-

and effect was to assure these women that their signing was only for the purpose of having an election."

The Seventh Circuit, expressly relying on *Swan*, refused enforcement of a bargaining order in NLRB v. Dan Howard Mfg. Co., 7 Cir., 390 F.2d 304 (January 12, 1968). In that case one employee who had signed a card had been told falsely that a majority had already signed. Another was told that the purpose of the card was to admit her to a meeting. The court observed, "The fact that the language of the card was unambiguous is of little significance in light of [the signer's] testimony as to her conversation with [the solicitor] and her testimony that she did not read the card nor did anyone read it to her."

In several recent decisions the Fourth Circuit has stated in strong terms that authorization cards are a highly unreliable method for determining employee choice. That court has taken the position that an employer is entitled to have a good faith doubt of a union's majority support when it is based on cards alone, NLRB v. S. S. Logan Packing Co., 4 Cir. 1967, 386 F.2d 562; Crawford Mfg. Co.

v. NLRB, 4 Cir. 1967, 386 F.2d 367,[15] except in the rare instance when the employer verifies the majority status himself and finds that it does in fact exist. NLRB v. Sehon Stevenson & Co., 4 Cir. 1967, 386 F.2d 551. Although we find the arguments advanced in those opinions persuasive, at this time in this case it is unnecessary to go as far as the Fourth Circuit has gone.[16]

The District of Columbia Circuit adheres to *Cumberland*. In International Union UAW, etc. v. NLRB, D.C. Cir., 392 F.2d 801 (November 14, 1967) (Preston Products Co.), over a dissent calling attention to *Swan*, the court upheld a bargaining order despite evidence of misrepresentation in the solicitation of the cards. The court distinguished *Nichols* and *Swan* on the ground that in each case the union had never actually sought an election, while in *Preston* it had, and that therefore it was not a misrepresentation to say that one purpose of the cards was to call for an election.[17]

We return now to the facts before us.

We note, first, that most of the employees here had not completed high school and that many could not read well.

---

ing bargaining rights without an election", the same procedure followed by the Union in the present case.

15. Cert. denied 390 U.S. 1028, 88 S.Ct. 1408, 20 L.Ed.2d 286. In its petition for certiorari, the Board requested the Supreme Court to resolve the conflict in the circuits, and specifically noted that this Court has not followed the *Cumberland* rule.

16. The Third, Eighth, Ninth and Tenth Circuits have not spoken recently on this issue, and in view of the rapid alterations in position in the recent cases, we do not rely on their earlier opinions. But see Bauer Welding and Metal Fabricators, Inc. v. NLRB, 8 Cir. 1966, 358 F.2d 766, where the court refused to enforce a bargaining order on the ground that, while the cards themselves were clear, the covering letter with which they were sent to the employees strongly suggested that they should sign and return the cards in order to get an election. The court held that the *Joy Silk* doctrine, excluding evidence of employees after-

thoughts, does not apply where there is misrepresentation as to the purpose of the cards. In NLRB v. Quality Markets, 3 Cir.1967, 387 F.2d 20, the court enforced an order of the Board requiring the company to bargain, premised on the Board's finding that the union had obtained authorization cards from a majority of the employees in a proper unit. The Court referred to the unreliability of authorization cards as a method of determining majority support, but held that the evidence supported the Board's determination that the employer lacked a good faith doubt of the majority status. The court expressly noted that there was no suggestion of misrepresentation in the solicitation of the cards, citing River Togs, Gotham Shoe, S. E. Nichols and Crawford, id. at 24 n. 4, and suggested that there are cases which would not support a bargaining order based on authorization cards. Id. at 25.

17. Cf. NLRB v. Southbridge Sheet Metal Works, Inc. 1 Cir. 1967, 380 F.2d 851.

Many of the employees, "unlearned in the 'witty diversities' of labor law"; accepted without comment the solicitors' explanation that the cards designated the Union as their bargaining representative; what interested them was that, if enough cards were signed—there would be an election.

 Looking at the face of the card, we find that it clearly states that the signer designated the Union as the bargaining agent of the employees in the unit. But exclusions may be more telling than inclusions. If an authorization card is to be relied upon in lieu of an election, it is only fair for the cards to say so. In the light of the solicitor's oral statements, the omission of such a statement was a misrepresentation of the purposes for which the card was to be used. We observe too that the card omits any reference to the signer's membership in the Union. As the court said in *Nichols*, this is "one thing an employee would readily understand". At the bottom of the card is the statement, "Neither your employer nor his representative will ever see this signed authorization". It would be difficult for the average employee to reconcile this statement with the ostensible purpose of using the cards for recognition of a union composed of the signers and, of course, the other members of the unit. (There is no evidence that the solicitors explained that a neutral third party would check the cards.) This caveat of confidentiality creates the impression that the act of signing was not in itself the critical act; the cards would form a basis for a secret election.

 On their face, the authorization cards were not as ambiguous as those used by the union in *Peterson Bros.*, but they were more ambiguous than those used in *Engineers & Fabricators*. Taking the cards with the solicitors' explanation, the cards were as much for a dual purpose here as they were in *Peterson Bros.* The effect of signing must be considered within the context of the solicitation; otherwise, it would be too easy for a union to circumvent employee freedom of choice by saying one thing and doing another when dealing with relatively unsophisticated employees.

The trial examiner tried this case on the assumption, quoting *Joy Silk*, that an employee's state of mind as to why he signed a card "cannot negative the overt action of having signed a card designating a union as bargaining agent". The examiner's criterion was "whether the employee signed for the limited or *sole* purpose of obtaining an election". The Board adopted the examiner's findings and conclusions. In the light of *Peterson Bros.* and *Engineers & Fabricators*, the examiner and the Board employed the wrong legal standards.

 We have reviewed the record with more than usual care.[18] There is substantial evidence to support the finding that the union solicitors in many instances explained that the cards designated the union as the bargaining agent of the employees. Consistent with the examiner's premises, this finding was enough to justify the examiner's conclusion that the solicitors did not represent to the signers that the cards were *solely* for an election. At the same time there is undisputed evidence that the solicitors told at least as many as a dozen employees that a purpose of the cards was to obtain an election. At least eight and perhaps more employees were permitted to sign under the impression that the

18. The Company strongly urges that the Board improperly excluded 12 over-the-road truck drivers from the unit it approved. The Board has wide discretion under section 9(b) to determine appropriate units. Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040. Here, substantial evidence supports the Board's determination that there was a lack of community of interest between the truck drivers and the in-plant employees. The Company makes much of the fact that the Union organizer made minor alterations in some of the cards and also complains that supervisors were present at the time some of the cards

cards were to be used to obtain an election.[19] Except in one instance,[20] the

trial examiner did not discredit the signers' testimony; he disregarded it. On

were signed. The evidence supports the Board's findings that the alterations were insubstantial and that the supervisors did not solicit the signatories. The Board did invalidate one card on the ground that it was solicited by a supervisor.

19. *J. W. Trisler*, the principal union organizer, testified: "Q. Well, Mr. Trisler, in your conversation with Letha Ward did you not in fact tell Letha Ward that if you were able to secure enough cards, you would ask the Labor Relations Board to hold an election?" "A. I told her that the Oil Workers felt they were ready to petition for an election, that they might do that, yes, sir." "Q. Does it not say right here, Mr. Trisler, 'I told Ward that if we were able to secure enough cards that we would ask the Labor Relations Board to hold an election'?" "A. Yes, sir, it is in the statement." (Statement given General Counsel by Trisler). "Q. And, you in fact told her that, did you not?" "A. As well as I can remember that is practically, I am pretty sure it is pretty close to what I told her concerning an election. That was about the only thing she was concerned about. I told her to read her card real good."

*Letha Ward* testified: "Q. What did he tell you? That is, about the cards on that occasion?" "A. He (J. W. Trisler) was just trying to get all the employees to sign a card so they could bring it to a vote, as to whether the Company would go Union or not."

\* \* \* \* \*

"Q. What did they (Jim Pat Smith and J. W. Trisler) tell you about the card?" "A. They told me that signing a card meant that the Union could bring it to a vote to see whether the employees wanted to have a union or not." "Q. Did you tell them anything in this connection?" "A. I told them that as far as I was concerned, I knew how I would vote if it would be brought to a vote and they told me that for my fellow employees I should give them a chance to do what they would want to do. That was why I should sign it." "Q. Do you remember Mr. Trisler saying something to the effect that—asking you sign an authorization card for the Oil Chemical and Atomic Workers to represent you in bargaining at Southland; is that what he said:" "A. He asked me if I would like to sign a card to say that if the union was able to get enough cards signed that they could ask the Labor Board for an election; do you remember him saying something like that?" "A. He said that if there were enough cards signed that the employees could call for an election."

In spite of Trisler's corroboration of Ward's testimony, the trial examiner discredited her testimony as "vague, uncertain, and not persuasive". Notwithstanding our customary reliance on the trier of facts to determine credibility, we feel compelled to rule that the clear preponderance of all the relevant evidence convinces us that the trial examiner erred in discrediting Ward's testimony relating to Trisler's representation.

*Julius Hess* testified: "Q. What did he tell you about the card?" "A. He said go ahead and sign it, it is just to bring it to a vote." "Q. Was that the purpose for which you signed the card?" "A. Yes."

*Ted Noggler* testified: "Q. Did he (John Smith) say anything to you about the card, at the time he gave it to you?" "A. He said it was to represent, to bring it to a vote." "Q. He said it was to represent—" "A. I mean to bring the Union to a vote."

\* \* \* \* \*

"Q. Did or did not Mr. Smith tell you that this card authorized the union to represent you?" "A. Well, he could have, but at the same time, he said it didn't mean nothing but to bring it to a vote." This witness admitted he had difficulty in reading and did not read the entire card.

*Wayne Mullins* testified: "Q. Do you remember what date?" "A. February 28." "Q. Where did you sign the card?" "A. J. W. Trisler's house." "Q. Did anybody tell you what the purpose of the card was?" "A. Yes, sir, to have a Union bargain for us to bring us to a vote." "Q. To bring to a vote?" "A. Yes, sir." "Q. Who told you that?" "A. J. W. Trisler."

*Bill Jones* testified: "Q. Did he (Jim Pat Smith) tell you what the card was for?" "A. He told me it was to bring it to a vote." "Q. Did he tell you that before you signed it?" "A. Yes." "Q. Is that the purpose for which you signed it?" "A. Yes, sir." \* \* \* "Q. What did he say, if anything?" "A. He said they just had to have so many percentage of the people signing it before they would bring it to a vote." "Q. Did he ever say that he was not going to use the card for

the record before us we hold that the Board should have invalidated the cards of Ruby Floyd, Johnny Perry, Julius Hess, Wayne Mullins, Bill Jones, Ted Noggler, Emma Leverett, and Letha Ward.[20] Invalidation of these cards destroys the union majority.

\* \* \* \* \* \*

As to the 8(a) (1) and 8(a) (3) violations, the orders of the Board are enforced, except as modified with regard to Brown. As to the alleged 8(a) (5) violation, the portion of the order requiring the Company to bargain with the Union and to rescind its work rules will not be enforced.

the purpose of bargaining?" "A. Yes." \* \* \* "A. I didn't at first want to sign it until after he mentioned the vote."

*Johnny Perry* testified: "Q. Did Ronnie Harmon tell you anything about signing a card?" "A. Yes, about bringing it to a vote." "Q. What did he tell you about it, about bringing it to a vote?" "A. He told me if I would sign a card, it would bring it to a vote." \* \* \* "Q. Did anybody down there say anything to you about signing card, down at this meeting?" "A. They were talking about signing cards, needing more money and bringing it to a vote, but I don't remember which ones it was." "Q. About bringing it to a vote? You don't remember who said that?" "A. There were too many of them down there." (This witness admitted that it was hard for him to read.)

*Thomas Brinkley* (whose card was not counted) testified: "Q. What did they (Jim Pat Smith and J. W. Trisler) tell you about signing the card?" "A. They told me that they wanted to get people signed up so we could have an election. This Union did." "Q. For what purpose did they tell you the card was and who told you?" "A. Well, I believe it was Mr. Trisler and Mr. Smith both repeated that they needed just this one to get the boys signed up and we would have an election down there and get this over with."

*Ruby Floyd* testified: "Q. Was any conversation had about the card before you signed it?" "A. Well, they (A. C. Holder, Jim Pat Smith and John Smith) said they wanted to get the card signed so they could have an election."

"Q. What did you write on the paper?" "A. I asked him what about Rudy and the rest of the boys. He said, that Rudy said to get started and the rest would follow. He also said that that did not mean a thing, us signing the card, only just call an election." "Q. For what purpose did you sign the card?" "A. Well, that is the only purpose I signed it, just for an election."

\* \* \* \* \*

"Q. Mrs. Floyd, I understood you to say that you did not ask what the card meant; did anybody tell you out there what it meant?" "A. They just said it was to call an election. To vote, to take it to a vote, for the Union."

*Emma Leverett* testified: "Q. Who told you why they wanted you to sign it and what did they say was the reason they wanted you to sign it?" "A. Well, I don't remember which one said it particularly, (Jim Pat Smith, John Smith and A. C. Holder) but they said they needed so many names on the cards to have an election. They said it didn't mean anything, the card didn't, as far as which way you voted in the election." "Q. I will ask you, Mrs. Leverett, if anyone of them or either of them on that occasion advised you of the fact that signing the card designated the Union as your bargaining agent?" "A. No, it was just that we were going to have an election; I mean so many cards to have one. They said it did not mean we were for it, as far as that goes."

20. Letha Ward.

21. See footnote 19.