**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PETERSON BROTHERS, INC., including its division, Diversified Products Company, Respondent.**

**No. 21412.**

United States Court of Appeals
Fifth Circuit.

March 11, 1965.

Stephen B. Goldberg, Atty. N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Domonick L. Manoli, Associate Gen. Counsel, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, for petitioner.

Daniel R. Coffmann, Jr., and Hamilton, Bowden & Coffman, Jacksonville, Fla., for respondent.

Before TUTTLE, Chief Judge, and GROOMS and McRAE, District Judges.

TUTTLE, Chief Judge:

The principal issue in this petition of the N. L. R. B. for enforcement of its order is the correctness of its determination that the charging union represented for collective bargaining purposes a majority of the employees in an appropriate bargaining unit, and that the respondent was not acting in good faith in declining to recognize the union as representing such majority. There is no substantial issue drawn with respect to the alleged Section 8(a) (1) violations by the respondent.

The principal issue arises in the following manner: The union requested recognition from respondent on April 5, 1962, at which time there were 51 production and maintenance employees in respondent's two plants, both of which are in Jacksonville, Florida, at points approximately six miles apart. On that date, the union had in its possession thirty authorization cards collected from employees. These cards were headed, "Authorization for Representation," and contained the following language immediately above the signature blank:

"I, the undersigned employee, * * * hereby select the above named union as my collective bargaining agent."

There then followed spaces for information and then the following printed legend at the bottom of the card:

"This is not an application for membership. This card is for use in support of the demand of this union for recognition from the company in your behalf, *or for an N. L. R. B. election.*" (Emphasis added.)

On this critical date the union wrote the respondent demanding recognition based upon the claim that "more than 65 per cent of your production and maintenance employees in both plants * * have selected local Lodge No. 433 of the International Brotherhood of Boilermakers, etc. as their collective bargaining representative. Therefore, Local Lodge No. 433 requests recognition as the exclusive bargaining representative of the aforementioned employees." [1]

In the letter signed by its counsel, the respondent replied as follows:

"Please be advised that we do not believe that you represent a majority of our employees in an appropriate unit, and we therefore decline to recognize you as the bargaining representative until you have been certified by the N. L. R. B. for this purpose."

This was followed by a consent agreement signed by the respondent and the charging union agreeing to two elections, one to be held with respect to each of the separate employing units. Then, however, two days before the date set for the election the charging union filed its unfair labor charges with the Board based on the refusal of the respondent to recognize its bargaining status without an election. This, of course, aborted the election.

The Board found that of the 30 cards held by the charging union, 29 were to be considered as designations of the union as the employees' bargaining representative and that this constituted three more than the majority required to compel recognition. The respondent challenged the cards as unequivocally selecting the union as the bargaining representative, contending that many of them had been signed by the employees upon either a representation by the union representatives or upon an understanding, or both, derived from the language of the card, that their signature merely authorized the holding of an election. Respondent also contended that even if the Board correctly ascertained that a majority of the employees had chosen the union, it acted in good faith in refusing to recognize the existence of a majority, both because of its doubt as to the number of employees who had designated the union and as to the propriety of the bargaining unit.

Upon the hearing, the examiner found 26, or a bare majority, of the cards to be valid authorizations for union representation. The Board found 29 to be valid; one member dissented to the extent of finding that, in his opinion, only 28 were valid. It is not disputed that as to more than 5 of the disputed cards union representatives discussed with the signers that an election would be held. As to employee McElveen, the Board said, "We agree with the trial examiner, however, that the card signed by McElveen does not validly designate the union as his representative. McElveen had twice refused to sign a card at the solicitation of union representatives. The third time he was solicited they told him that signing a card would not affect his views with respect to the union, that it did not mean that he would be voting for it, and that if he wanted his card

1. The letter also contained the following language:
"In the event you have any doubt as to our representing a majority of your employees in the above unit, we will be more than willing to submit the signed authorization and membership cards of your employees to a neutral third party, mutually agreed upon, and allow such third party to compare said cards with your present payroll. "In the event you wish to take advantage of our offer to submit to a card check, you may contact us at the above address and we will be willing to meet with you for the purpose of selecting such third neutral party."

back he would be able to get it if enough cards had been signed so as to get an election. It is clear that representations were made to McElveen that the only reason he was being asked to sign a card was to help obtain an election, and that his original opposition to the union would not in any way be compromised if he signed the designation card."

As indicated above, the examiner found similar defects in three additional cards. This finding was based partially on the ambiguous language in the last sentence contained on the card itself. In connection with the Rhodes card he said, "Finally, the card itself, in conjunction with the testimony of Rhodes, stands for an ambiguous result or a net result that Rhodes signed the cards designating the union as his collective bargaining agent for the limited purpose of enabling the union to obtain an election."

■ In view of the language on the face of the card that "this is not an application for membership" and the language that in the alternative it is "for an NLRB election" we think there was a burden on the General Counsel to establish by a preponderance of the evidence that the signer of the card did, in effect, what he would have done by voting for the union in a Board election. We think that in refusing to consider the subjective intent of the signer of the

card, in light of the ambiguity on the face of the card, the Board erred. Upon a careful examination of the record we conclude that the trial examiner correctly found that the designation cards signed by Rhodes and Wright were not valid designations for the union.[2] We conclude that the Board's finding to the contrary is not based on substantial evidence on the record as a whole.

■ With respect to Henry Simpson's card we simply cannot accept, as based on substantial evidence, the Board's finding that it should be considered as authorization of the union for bargaining purposes. The card arrived by mail during the day at Simpson's house and during his absence his wife signed it and returned it by mail without Simpson's ever having read it and without any evidence that she had read it. In fact, Simpson could not read and did not write his name well. When he found out that his wife had signed the card and had her read the letter which had come with it he became angry. He repeatedly testified that he was neutral toward the union and was neither for it or against it. He stated that he did not try to get the card back because the president of the company had said that the cards did not make any difference because there would be an election. This reliance upon the president's statement might not have any substantial effect

---

2. In connection with the Rhodes case, the examiner said, "The card itself, in conjunction with the testimony of Rhodes, stands for an ambiguous result or a net result that Rhodes signed the cards designating the union as his collective bargaining agent for the limited purpose of enabling the union to obtain an election. For reasons previously stated, I do not believe that this is sufficient to establish that Rhodes had designated the union as his bargaining representative to secure recognition from respondent and to bargain with the respondent regarding wages, hours, and conditions of employment."

With respect to Mitchell Wright, Jr. the examiner found "Looking at Wright's testimony as a whole, I am not persuaded that the last question and answer, in the context of his preceding answer and other testimony is suffi-

cient to remove the doubts or ambiguity regarding Wright's card as evidence that he had designated the union as his bargaining agent to secure recognition and to bargain with the employer, rather than as evidence of an expression of willingness to help the union secure an election * * * in the substance, I believe, it is necessary that when an individual signs a card, the card and/or the circumstances must make it clear that the individual has declared himself a union adherent and had designated the union as his agent to secure recognition and bargaining and has thereby in effect voted for the union. I am unable, on the evidence before me, to conclude that the foregoing requirement has been met and my conclusion, therefore is that Wright's card, like Rhodes', must be rejected as evidence in support of the union's majority.

were it not for the ambiguous language on the face of the card. The Board laid great stress on the fact that Simpson told his son-in-law, an employee who favored the union, that he had sent in his card. This, it seems to us, is not sufficient indication that he intended for his card to be used for any purpose, much less as an authorization for the union's representing him as a bargaining agent.

Two other employees testified that they thought the cards were for the purpose of authorizing an election, but it may well be that there was sufficient evidence to support the Board's finding that, since they finally expressed themselves as being in favor of the union, their cards could be construed as authorizing the union to represent them as a bargaining agent.

It would be very simple for the union to prepare a card that in an unambiguous form would authorize union representation as a bargaining agent. If the union also wished to have cards signed to call an election this would also be a very simple matter. There can be little excuse for combining the two in a card that makes possible the misrepresentation that the Board found to have existed in the case of McElveen and the misunderstanding that the examiner found as to three other employees and which we now find as to four employees. Although the facts here are not as clear as to all of the employees involved touching on the representations made by the union organizers as in NLRB v. Koehler's Wholesale Restaurant Supply, 7 Cir., 328 F.2d 770, the same principle applies. Moreover, the card here contained an ambiguity that was not present in the Koehler case.

It appearing that the union did not have the requisite majority of the employees supporting it as their bargaining representative on April 5th, it was not an unfair labor practice for the respondent to decline to enter negotiations as requested.

The Board's order will be enforced as the 8(a) (1) violation. As to the 8(a) (5) charges, enforcement will be denied.