NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

J. M. MACHINERY CORPORATION,
Respondent.

No. 23756.

United States Court of Appeals
Fifth Circuit.

April 9, 1969.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel,

Dominick L. Manoli, Associate Gen. Counsel, Solomon I. Hirsh, Robert S. Hillman, Attys., N. L. R. B., Washington, D. C., for petitioner.

Jesse S. Hogg, John W. Boult, Fowler, White, Collins, Gillen, Humkey & Trenam, Tampa, Fla., for respondent.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

In November of 1964, ten of fourteen employees of J. M. Machinery Corporation (hereinafter Company) signed union authorization cards. On November 29, 1964, the Union's [1] representative sent a letter to the Company asserting that the Union represented a majority of the Company's employees, requesting recognition, and offering to demonstrate majority status through a card check by a third party. The Company did not reply but four weeks later stipulated to a Board-conducted election. The Union first filed an unfair labor practice charge during the course of the election campaign and filed additional charges after the election which the Union lost seven to six with one vote challenged. The Regional Director sustained the charges and set the election aside. The Union thereupon filed a refusal to bargain charge which has led ultimately to this appeal.

After a hearing, the Trial Examiner found that through coercive interrogation, threats, wage increases, and promises of both an employee's policy handbook and employer-employee grievance sessions the Company had violated Section 8(a) (1) of the Act, Title 29 U.S.C.,

Sec. 158(a) (1). He found further that by signing authorization cards a majority of the employees validly authorized the Union to represent them. The Trial Examiner thus concluded that the refusal to bargain on and after November 29, 1964, was motivated out of a bad faith attempt to dissipate the Union's majority and consequently was a violation of Section 8(a) (1) and (5) of the Act, Title 29 U.S.C., Sec. 158(a) (1) and (5). The Examiner's recommended order directed the Company to cease and desist its unfair labor practices, to post notices, and to bargain with the Union upon request. The Board's order, reported at 155 N.L. R.B. 860, affirmed the Trial Examiner's order and substantially adopted his findings, conclusions and recommendations.[2] The Board's petition for enforcement followed. The order will be enforced in part and denied in part.

## I.

### THE 8(a) (1) VIOLATIONS

We find that there is substantial evidence in the record as a whole to support the Board's conclusion that the Company had engaged in unfair labor practices in violation of Section 8(a) (1) of the Act. Universal Camera Corp. v. N. L. R. B., 1950, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Specific itemization of the evidence would serve little purpose here. Succinctly stated, the evidence indicated threats of moving the plant if the Union came in, of dismissal and of surveillance, promises of benefits and of financial help, wage increases to the two lowest paid employees, and unlawful interrogation of the employees.[3]

1. International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO Local 609.

2. The Board included the card of Richard Wood in the Union's majority while the Trial Examiner excluded Wood's card. This made the election results stand at nine for and five against union representation. See Note 5. The Board also stated additional grounds for finding that James Myers was a supervisor.

3. The Company asserts that it is entitled to make inquiries of its employees in order to ascertain their union views. While such an inquiry is proper, it can only be accomplished under carefully prescribed circumstances. Such controls were not exercised in the present case, accordingly the unlawful interrogation finding was proper. See International Union of Operating Engineers, Local 49 v. N.L.R.B., 1965, 122 U.S.App.D.C. 314, 353 F.2d 852. See also the Board's

██ One potentially troublesome point raised here is the factual determination of the status held by employee James Myers. Nine of the thirteen unfair labor practice violations that occurred were attributable to Myers. Predictably, the Company asserts that it should not be held responsible for Myers' conduct because he did not hold a supervisory position. Whether or not an employee is a supervisor is a question of fact and the Board's resolution of the issue is conclusive if supported by substantial evidence. Trailmobile Division, Pullman, Inc. v. N. L. R. B., 5 Cir. 1967, 379 F.2d 419; Peoples Service Drug Stores, Inc. v. N. L. R. B., 6 Cir. 1967, 375 F.2d 551; N. L. R. B. v. Griggs Equipment, Inc., 5 Cir. 1962, 307 F.2d 275. The Board's finding that Myers was a supervisor is primarily based on the credibility determinations of the Trial Examiner who credited the testimony of the employees over that of the Company officials. "It is generally held that whether made by jury, judge or agency a determination of credibility is nonreviewable unless there is uncontrovertible documentary evidence or physical fact which contradicts it". N. L. R. B. v. Dixie Gas, Inc., 5 Cir. 1963, 323 F.2d 433, 437. See also N. L. R. B. v. Plymouth Cordage Company, 5 Cir. 1967, 381 F.2d 710; Great Atlantic & Pacific Tea Company v. N. L. R. B., 5 Cir. 1966, 354 F.2d 707; N. L. R. B. v. Camco, Inc., 5 Cir. 1965, 340 F.2d 803, cert. denied 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339.

██ The Board's findings based largely on the employees' testimony are summarized below. Myers recommended several employees for hire and those men were subsequently hired. Company officials presented Myers to the men as Foreman and superintendent. On at least one occasion, Myers was involved in the disciplining of an employee. When employees wanted time off from work, they notified Myers. He assigned the men work and gave them instructions. The Company president asked Myers to help evaluate the employees' feelings about the Union and Myers rather zealously complied with the request.

We conclude that substantial evidence supports the Board's finding that Myers was a supervisor[4] and that the Company was responsible for his acts. In view of this holding it is not necessary to consider the Board's alternative theory, which briefly stated was that because the employees reasonably regarded Myers as representing management policy, the Company should be responsible for his acts even if Myers was not a supervisor.

## II.

### THE 8(a) (5) VIOLATIONS

██ The more difficult question presented by this appeal is whether the Board properly found that the Company violated Section 8(a) (5) of the Act by refusing to bargain with the Union on and after November 29, 1964. The Trial Examiner's order which the Board adopted held that the Company in bad faith refused recognition in order to gain time to undercut the Union's majority. As evidence of bad faith, the Board relied solely on the numerous Section 8(a) (1) violations. It is axiomatic that a company may not be found to have refused to bargain in bad faith if at the time of the union's request, the union did not have a majority. I.T.T. Semi-Conductors, Inc. v. N. L. R. B., 5 Cir. 1968, 395 F.2d 257; N. L. R. B. v. Southland Paint Company, Inc., 5 Cir. 1968, 394 F.2d 717; N. L. R. B. v. Lake Butler Apparel Company, 5 Cir. 1968, 392 F.2d 76; N. L. R.

---

decision on remand. Struknes Construction Co. and International Union of Operating Engineers, Local 49, 1967, 165 N.L.R.B. 102, in which the Board enunciated five conditions which must be met before polling of employees may be classified as lawful.

4. For a discussion dealing with the definition of supervisory status, see NLRB v. Security Guard Service Inc., 5 Cir. 1967, 384 F.2d 143.

B. v. Peterson Brothers, Inc., 5 Cir. 1965, 342 F.2d 221. Thus we must first determine if the Board was correct in finding that the Union had a majority at the time of its demand.

■ Here the conclusion of the Board that a majority status was demonstrated in spite of the Union's loss in the election is based solely upon the fact that a majority of the employees had signed authorization cards.[5] The Board found that the cards were unambiguous because they contained no mention of an election and plainly stated that the employee was authorizing the Union to be his collective bargaining agent. The Board found further that there was no evidence of misrepresentation.[6] Therefore the Board applied its usual rule that valid authorization cards may not be questioned. Thus the Board concluded

that inquiry into the thoughts and afterthoughts of the signer need not be made. Joy Silk Mills, Inc. v. N. L. R. B., 1950, 87 U.S.App.D.C. 360, 185 F.2d 732, cert. denied 341 U.S. 914, 71 S.Ct. 734, 95 L. Ed. 1350; but see N. L. R. B. v. Southland Paint Co., supra, 394 F.2d at 724; Edward Fields, Inc. v. N. L. R. B., 2 Cir. 1963, 325 F.2d 754.

■■ Because of their frequent unreliability [7] this Court scrutinizes with great care authorization cards which form the basis of a majority claim. We think the test enunciated in N. L. R. B. v. Peterson Brothers Co., supra, is a good and fair legal standard, i. e. the Board must establish that the signer of the card did, in effect, do what he would have done by voting in a Board election. This rule protects the vital interest in the selection of a bargaining representative

---

5. Of the appropriate unit of fourteen employees, ten signed cards. The Trial Examiner excluded two of these cards. Employee Pope's card was not counted because he had not signed a card until April, 1965, four months after the election. Employee Wood's card was eliminated because the Trial Examiner found that he had a strong company bias and would have voted against the Union even if no unfair labor practices had occurred. The remainder of the cards were held to be valid authorizations by the Trial Examiner thereby giving the Union a majority of one, eight of fourteen. The Board agreed with the exclusion of Pope's card but counted Wood's. The basis for the Board's inclusion of Wood's card was that in view of the unambiguous nature of the card and the thorough explanations of the consequences of signing the card, the Trial Examiner improperly considered Wood's subjective intent and should not have speculated as to how Wood would vote.

6. It is apparent from the quoted language below that the Trial Examiner used the doctrine of Cumberland Shoe, 1963, 144 N.L.R.B. 1268, enforced, 6 Cir. 1965, 351 F.2d 917, to test whether or not there had been misrepresentation in the procurement of the cards. "Other witnesses testified that the Union leaders at the meeting did not indicate that the cards would be used *only* for an election. * * *" " * * * I find that the employees were not told before they signed, the cards were *just* for an elec-

tion. * * *" (Emphasis added). Although the Trial Examiner cited no authority for the above statements, they are principled upon the *Cumberland Shoe* doctrine which holds that a card can only be invalidated when the employee is told that the card is for the sole purpose of obtaining an election. This circuit has rejected this test. See N.L.R.B. v. Lake Butler Apparel Company, supra; Engineers & Fabricators, Inc. v. N.L. R.B., 5 Cir. 1967, 376 F.2d 482.

7. For a discussion of the reliability problem, see N.L.R.B. v. Southland Paint Co., supra; N.L.R.B. v. S.S. Logan Packing Company, 4 Cir. 1967, 386 F.2d 562; Comment, Union Authorization Cards, 75 Yale L.J. 805 (1966). We note also that the United States Supreme Court has recently granted certiorari at 393 U.S. 997, 89 S.Ct. 482, 21 L.Ed.2d 462, in two cases, N.L.R.B. v. Gissel Packing Co., 4 Cir. 1968, 398 F.2d 336 and N.L.R.B. v. Sinclair Co., 1 Cir. 1968, 397 F.2d 157. These cases present the question of whether or not an employer, because of the alleged inherent unreliability of authorization cards, is justified in refusing to bargain when the only proof of a union's majority is authorization cards. The Supreme Court's determination of that issue will have little effect on the case at bar because here the cards were obtained through misrepresentation whereas there is no issue of misrepresentation in the cases which the Supreme Court has under consideration.

—employee free choice. Accordingly to help determine if such a choice has been made, this Circuit has held that an inquiry into the subjective intent of the signer must be made in at least two instances: first, when the only proof of union majority is ambiguous authorization cards, I.T.T. Semi-Conductors, Inc., supra; N. L. R. B. v. Southland Paint Co., supra; N. L. R. B. v. Peterson Brothers, Inc., supra; second, when unambiguous cards are challenged with proof of misrepresentation in their procurement. N. L. R. B. v. Texas Elec. Cooperatives, 5 Cir. 1958, 398 F.2d 722; N. L. R. B. v. Lake Butler Apparel Co., supra; Engineers & Fabricators, Inc. v. N. L. R. B., supra.

Our immediate task then is to determine if the authorization cards are free from the ambiguities found in the cards used in *I.T.T. Semi-Conductors,* supra, *Southland Paint,* supra, and *Peterson Brothers,* supra. After comparing the three cards used in these cases, we conclude that the card in the present case is less ambiguous than those used in *I.T.T. Semi-Conductors* and *Peterson,* but contains the same ambiguity as Judge Wisdom found in Southland. For the purposes of comparison the texts of the two cards are set out below.[8]

The differences in the two cards are not significant. The *Southland* card has the sentence "THE LAW OF THE UNITED STATES PROVIDES THAT * * *" while the card in dispute has no such statement. The *Southland* card contains the "CONFIDENTIAL" phrase which is absent in the present case. The *Southland* card is silent as to the matter of membership while the card in the case

8.  The *Southland* card read as follows:

THE LAW OF THE UNITED STATES PROVIDES THAT:
Workers have the right to designate a union to represent them for the purpose of collective bargaining with their employer.

AUTHORIZATION

Name _____
Address _____ City _____
Employer _____
Area _____ Shift _____ Classification _____
    I hereby designate and authorize the Oil, Chemical and Atomic Workers International Union, AFL–CIO, as my collective bargaining agent in all matters pertaining to wages, rates of pay and conditions of work.

_____
Signature

Date _____
Witness _____
CONFIDENTIAL: Neither your employer nor his representative will ever see this signed authorization.
    The card used in the case at bar reads:

AUTHORIZATION FOR REPRESENTATION
(This is not an application for membership)
INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL–CIO.
Fill in all blanks                    Date _____
    I The undersigned employee of _____

(name of company)
hereby select the above named Union as my collective bargaining agent.
Name of Employee _____
Home Address (please print) _____
City _____ .
State _____
Phone _____

_____
Signature

at bar specifically states that it "is not an application for membership".

The similarities between the two cards on the other hand are highly significant. Neither card makes any mention of the election possibility. Neither card clearly states that if a majority of the appropriate unit sign the authorization cards, recognition may be obtained without an election. Neither card gives the impression of cruciality that one might expect if the signing of a card may serve as a substitute for an election. Judge Wisdom explained in *Southland* that the caveat of confidentiality contained in the card created the impression that the signing of the cards was not a crucial act, rather it gave the impression that the cards would form a basis for a secret election. We think the lack of an impression of cruciality is even more manifest here because the card contains the phrase "This is not an application for membership". It would be difficult for the average employee to understand that although he signs a card which plainly states that it does not make him a member, the union can use that same card to seek recognition without an election and if recognized, become his bargaining agent. Thus, the disclaimer of membership creates the impression that the act of signing was not in itself the critical act and the resulting conclusion that the cards would form a basis for an election seems to be a reasonable and natural consequence. In sum, the words of Judge Wisdom in *Southland* seem uncommonly appropriate:

> "*Looking at the face of the card, we find that it clearly states that the signer designated the Union as the bargaining agent of the employees in the unit. But exclusions may be more telling than inclusions. If an authorization card is to be relied upon in lieu of an election, it is only fair for the cards to say so.* In the light of the solicitor's oral statements, the omission of such a statement was a misrepresentation of the purposes for which the card was to be used. We observe too that the card omits any reference to the signer's membership in the Union. As the court said in Nichols (N. L. R. B. v. S. E. Nichols Co., 2 Cir. 1967, 380 F.2d 438) this is 'one thing an employee would readily understand'." (Emphasis added)

To conclude, the card is ambiguous because it does not state the purposes for which it may be used and this ambiguity is further compounded by the non-membership disclaimer. To reiterate, if unions wish to perfect their majority claims on the basis of authorization cards they should do so with cards which clearly state their purpose.

Although we have held these cards to be ambiguous, our task has not ended. We must carefully examine the effect of signing within the context of solicitation in order to determine if the employees understood what they were signing. N. L. R. B. v. Texas Elec. Cooperatives, supra; N. L. R. B. v. Southland Paint Co., supra. Thus we now turn to the facts and circumstances before us.

Five of the nine cards were signed after hours in the parking lot of the "Idle Hour" tavern. Former employee Ivan Harmon signed up four of the five men present.[9] All but one of the men testified that Harmon had told them that the cards would be used to obtain an election.[10]

---

9. Five of the seven cards signed at the "Idle Hour" meeting were ultimately counted as part of the Union's majority; i. e. those of Wood, Green, Griffin, Langston, and Hornsby. Two other men, Ivan Harmon and Sheffield, signed but were never counted as part of the Union's majority. The four men Harmon got to sign were Wood, Green, Griffin and Sheffield. Langston and Hornsby did not sign until later that evening.

10. Harmon addressed the men individually rather than as a group. Harmon was not asked about what representations he made to the men. Langston, who did not sign until later, was also not asked about Harmon's solicitations. Employees Wood, an illiterate, Green and Griffin testified that Harmon told them that the cards would be used to obtain an election. Their testimony also reflected that they signed the cards to prevent

---

After these men had signed, employee Hornsby arrived. He testified that he told the men that "it was not a membership card, that it was strictly a card which we had to have a majority of the people to sign in order to obtain recognition from the Company." [11] A short time later, Union representative Mills arrived and spoke to the men as a group. He testified that he explained that by obtaining fifty-one percent or better, a letter could be sent to the Company demanding recognition. Mills further testified that he made no mention of the election possibility. This then is a summary of the events which surrounded the card signing.

To further support the contention that the signers knew what they were signing, the following facts were relied on by the Board. Hornsby testified that he told Griffin on the day after the "Idle Hour" meeting that "[I]n two or three days you will probably see a man drive up here with a registered letter and the letter will be coming from a Union agent for representation—asking for immediate recognition". Further, the Board inferred that Griffin and Wood intended to authorize the Union as their bargaining agent in November 1964 because they signed the same kind of card in a second organization drive in April, 1965.

The presigning "Idle Hour" solicitation when coupled with the ambiguous cards was misrepresentative.[12] We have previously noted the testimony of the employees relating to the representations made to them by the unsupervised solicitor, Ivan Harmon.[13] The significance of their testimony is not negated by the Trial Examiner's finding that "the employees were not told before they signed the cards that the cards were just for an election, and that on the contrary, they were told that the cards were for the purpose of obtaining Union representation". We interpret this statement to mean that before the men signed they were told that the cards would be used to obtain recognition without an election. If this were the case, we would apparently have no choice but to affirm under the *Southland* holding which stated at 394 F.2d 717, 730:

"There is substantial evidence to support the finding that the Union solicitors in many instances explained that the cards designated the Union as the bargaining agent of the employees. Consistent with the examiner's premises, this finding was enough to justify the examiner's conclusion that the solicitors did not represent to the signers that the cards were *solely* for an election."

anyone from getting mad at them and that they intended to make their decision at the election. However because of Wood's strong company bias his testimony was discredited by the Trial Examiner. Former employee Sheffield stated that Harmon told him that "it would take 30 percent to have an election but he didn't want an election * * * [T]he Union would get behind this thing if we got 50 percent".

11. The significance of the above statement is somewhat clouded by Hornsby's follow-lowing testimony:
"Q. Had the subject of a letter been mentioned to the employees, a letter demanding recognition been mentioned to the employees the night before (the night of the 'Idle Hour' meeting)?
A. The night before, no, not that I know of.

Q. If it was mentioned, you did not hear it?
A. If it was mentioned I did not hear it."

12. The Company asserts that the cards of Griffin, Green and Wood were not valid authorizations. If its contention is correct as to any two of these men, the Union's majority is destroyed. Thus the whole dispute centers around these men. Consequently the following shorthand terminology will be used. The representations made to the men by Ivan Harmon will be referred to as the "presigning solicitation" period because the men signed the cards after his solicitation. The representations by Hornsby and Mills which were made subsequent to the signing shall be designated as the "postsigning solicitation" period.

13. See Note 10.

However the record clearly indicates that the statements concerning recognition without an election came after the men had signed.[14] The record reflects that only Wood, whose testimony was discredited, Griffin, Green and Sheffield testified as to the representations made by Ivan Harmon. Their testimony indicates that they were only told that a purpose of the cards was to obtain an election. Their testimony (with the possible exception of Sheffield's) gives no indication that Harmon informed them of the no election possibility. Thus if there was no mention of Union representation without an election, the fact that the men were not told that the sole purpose of the card was to obtain an election does not indicate that no misrepresentation occurred.[15] As a result, the Trial Examiner and the Board committed errors of fact and law. First, there is no substantial evidence to support their conclusion that the men were informed before signing that the signing of the cards authorized possible Union representation without an election. Second, they applied the wrong legal standard in determining if there was any misrepresentation, i. e. the sole purpose test. N. L. R. B. v. Southland Paint Co., supra; N. L. R. B. v. Lake Butler Apparel Company, supra; Engineers & Fabricators, Inc. v. N. L. R. B., supra.

In sum, the record reflects that the men signed ambiguous cards which were solicited by an unsupervised employee who at least told them that a purpose (as distinguished from the sole purpose) of the cards was to hold an election. These facts are remarkably similar to those found to be misrepresentative in *Southland*. Consequently, if this were all that was involved in the case we could deny enforcement without elaboration under the *Southland* authority. However the events, previously outlined, which occurred after these men signed necessitates closer examination.

Essentially we are faced with the following question: Were the representations, made after the cards had been signed, sufficient to clear up the possible misunderstanding created by the ambiguous cards and Harmon's solicitation? Apparently this is a novel question as our research indicates no factual parallel. Indeed neither the Board nor the Company dealt with this problem. The Company's focus was upon the ambiguity of the cards which is understandable in view of the fact that *Southland* was decided after the submission of its brief. The Board simply failed to delineate between presigning and post-signing solicitation.

However, the dicta in the Board's order [16] suggests the one possible theory supportive of the conclusion that the post-signing declarations were sufficient to eliminate the doubt as to the employees' intent created by the presigning misrepresentation. The theory is that if the employees did not intend to authorize union representation, they, upon learning of the cards' true purpose, would have revoked their authorization. Thus the absence of revocation under this theory is a clear indication of the employees' intent. The logical extension of this concept is that unrevoked cards should be counted as part of the

---

14. The only evidence which can possibly be construed as apprising the employees of the no election possibility is the testimony of Sheffield which we have previously quoted. See Note 10. Even if Harmon's comments to Sheffield were interpreted as informing Sheffield that recognition could be secured without an election it carries little weight with reference to Wood and Griffin because Sheffield testified that he could not vouch for what was said to anyone else. The other evidence supportive of the inference that the

men knew about the no election possibility is the testimony of Hornsby and Mills. Undeniably their testimony dealt with events which occurred after Wood, Griffin and Green had signed.

15. See Note 6.

16. "The card signed by Wood in November 1964 expressly authorized the Union to bargain on his behalf and Wood made no attempt to revoke their authorization".

union's majority, even though the initial signing had been procured by the use of ambiguous cards and misrepresentative statements, if after the signing, the union officials unambiguously and without misrepresentation explained the purposes of the cards.

While we do not discount for all purposes the significance of the lack of revocation by employees, severe practical consequences foreclose the acceptability of the theory that the lack of revocation coupled with the proof of the making of post-signing curative declarations is sufficient to sustain the burden of proof as to the signers' intent. First, the natural reluctance of an employee to go against the wishes of his fellow employees casts significant doubt as to the probative value of the lack of revocation. The Fourth Circuit in N. L. R. B. v. S. S. Logan Packing Company, supra, 386 F.2d at 566, made mention of this problem:

> "Most employees having second thoughts about the matter and regretting having signed the card would do nothing about it; in most situations, only one of rare strength of character would succeed in having his card returned or destroyed."

Second, the promulgation of such a rule would provoke strong temptation to abuse. Union representatives might feel free to use virtually any means to obtain signatures and only afterwards tell the employees about the card's true purposes. Thus if at the time of its demand for recognition it had a majority, the union under this theory could claim that the cards were valid because if the employees did not intend to authorize union representation they would have revoked their cards after hearing the post-signing representations.

If post-signing declarations may be used to cure defects in the solicitation process, we think it is incumbent upon the General Counsel to prove not only that the statements were made but also that the signers understood and intended to adopt the post-signing explanations. No such attempt was made here. After the cards were signed, the men waited for the arrival of Mills who explained the purposes for which the cards might be used. There was no evidence that the men understood or even listened to what Mills was saying.[17] There was no evidence that the men were told that they could revoke the cards even if they had possessed "rare strength of character". In short, we apply the rule expressed in N. L. R. B. v. Lake Butler Apparel Co., supra, and Engineers & Fabricators, Inc. v. N. L. R. B., supra, which states that "the burden of proof is on the General Counsel, *once* representation cards are challenged as here because of misrepresentation in their procurement and proof is offered which substantiates the challenge, to show that the subjective intent to authorize union representation was not vitiated by the misrepresentation". Here, the ambiguous nature of the cards and the representations by Harmon warranted an inquiry into the subjective intent of the employees. Thus we conclude that the General Counsel failed to sustain its burden of proving that the men understood what they were signing because there was no probing into the subjective intent of the employees to determine if the workers comprehended and accepted the post-signing declarations of the Union solicitors. On this record the Board should have inquired into the subjective intent of at least two employees, Wood and Griffin.[18]

17. Indeed the evidence points to the opposite conclusion. The prime Union leader within the plant, Carlton Hornsby, testified that he heard no mention of the fact that a letter requesting recognition would be sent to the Company, a statement which Mills was credited as having made.

18. The Board held that the Union validly acquired the support of nine of fourteen

workers. Thus with the elimination of Wood's and Griffin's cards the count is reduced from nine to five to seven to seven. Consequently the Union did not have a majority at the time of its demand and the Company had no duty to bargain. Since the Union is without a majority it would be superfluous to consider the validity of other authorization cards. As a result we need not

The Trial Examiner specifically found that Wood would have voted for the Company even if there had been no unfair labor practices. In fact, the Trial Examiner found Wood to be so company-biased that he discredited his testimony. Yet the Board, steadfastly adhering to the *Joy Silk* doctrine that the thoughts and afterthoughts of employees cannot negate the overt act of signing an authorization card, came to the incongruous conclusion that Wood had authorized Union representation in spite of his company bias. Given the misrepresentative circumstances in which Wood's signature was obtained, the Board erred in failing to inquire into his subjective intent.

Admittedly Griffin's situation is somewhat different. In addition to the speeches of Hornsby and Mills which were delivered in the parking lot of the "Idle Hour" tavern, Griffin had the benefit of Hornsby's statement made on the following day that a letter demanding recognition would arrive in two or three days. While such evidence has clear weight it is far from conclusive as to Griffin's subjective intent because there was no showing that Griffin understood and accepted Hornsby's remarks to stand for the proposition that the cards would be used to request recognition without an election.[19] Similarly the fact that Wood and Griffin signed authorization cards in a second organization drive contributes little to the question of the men's intent. Even if the men intended to authorize Union representation on the second signing, that fact is simply not conclusive as to what the men intended when they signed the cards originally. It may well be that the men changed their minds because of the hostility displayed by the Company during the first organization drive.

In conclusion, we hold that where proof of misrepresentation during the presigning solicitation has been made, post-signing statements cannot be used to cure the defects unless there is a clear showing by the General Counsel that the subjective intent of the signers was to authorize union representation. Since the General Counsel did not make such a showing here, it failed to sustain its burden of proving that the signers did what they would have done in an election. Consequently there is no substantial evidence to support the Board's conclusion that a majority of the employees had authorized the Union to be their collective bargaining agent.

---

discuss either the validity of Green's card or the Board's contention that consideration of this specific objection raised for the first time on appeal would be in violation of 29 U.S.C. § 160(e) which states in pertinent part that "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."

19. The following testimony reflects the nature of Griffin's intent and the treatment given it by the Trial Examiner in his intermediate order:

"Q. Dennis, why did you tell Mr. Mraz that you'd signed the card the first time?

A. Well, because I was with the Company and I just wanted to keep everybody happy in the shop.

Q. When you signed your card the first time before the election, were you in favor of having the Union come in?

A. No, sir, I just signed it to keep harmony in the shop.

Q. As an offer of proof, Dennis, I would ask you on the occasion of your signing the first card would you have signed that card to bring in the Union without having an election?

A. No, sir."

The Trial Examiner stated in his order:

"With respect to Griffin's subjective state of mind at the time he signed the card, I adhere to my ruling rejecting the Company's attempt to inquire in that area, and I place no weight on Griffin's testimony on that matter even where he answered without objection from General Counsel. As stated in *Joy Silk Mills* 'an employee's thoughts (or afterthoughts) as to why he signed a Union card and what he thought that card meant, cannot negative the overt action of having signed a card designating the Union as bargaining agent.' "

There being no basis for finding a refusal to bargain other than the Board's reliance upon the signing of the cards, the order of the Board requiring bargaining with the Union cannot be enforced. Since we cannot enforce the Board's finding that the Company had a duty to bargain we need not consider the question of good faith refusal.

As to the 8(a) (1) violations, the orders of the Board are enforced. As to the alleged 8(a) (5) violation, the portion of the order requiring the Company to bargain with the Union will not be enforced.

The order is enforced in part and denied in part.