STEPHEN A. HIGGINSON, Circuit Judge,
dissenting:
I write separately to concur in large part but dissent in small part, because I agree with the majority that the National Transportation Safety Board (“NTSB”) did not err reversibly in rejecting (1) Boeta’s assertion that the administrative law judge (“ALJ”) improperly limited his cross-examination of several witnesses and (2) his affirmative defense of reasonable reliance. I respectfully dissent, however, from the majority’s reversal of the NTSB’s decision affirming the ALJ’s determination that Boeta was not entitled to a waiver of sanction. The Federal Aviation Administration (“FAA”) sanction was upheld after two evidentiary hearings before the ALJ, spanning three days in total, and then again on appeal by the NTSB. I do not perceive the NTSB’s rulings to be arbitrary and capricious and believe its factual findings are consistent with the record. For these reasons, and because the NTSB’s findings of fact as to phot safety requirements have such importance and sensitivity, I would not disturb Boeta’s sixty-day pilot suspension.
Under this court’s precedent, appellate review of NTSB decisions is circumscribed and highly deferential. See Miranda v. Nat’l Transp. Safety Bd., 866 F.2d 805, 807 (5th Cir. 1989); Tokoph v. Blakey, 73 Fed.Appx. 772, 773 (5th Cir. 2002) (“We accord substantial deference to the NTSB’s interpretation of the statutes and regulations it administers.”). We must uphold a decision of the NTSB unless it is “unsupported by substantial evidence” or is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A),(E); see Miranda, 866 F.2d at 807; Harris v. Hinson, 111 F.3d 892, at *1 (5th Cir.1997) (unpublished).
The NTSB was correct to affirm the ALJ’s finding that Boeta’s violation was not inadvertent. It is undisputed that Boe-ta flew in Reduced Vertical Separation Minimum (“RVSM”) airspace without the required authorization. The ALJ, the fact-finder tasked with hearing live testimony, including Boeta’s, for a total of three days, discredited Boeta’s claim that his violation occurred because he had misplaced his trust in Capital Aerospace, LLC (“Capital”), and that individuals at Capital had lied to him by telling him on multiple occasions that the aircraft’s RVSM authorization was still valid. The ALJ additionally did not find credible or logical Boeta’s claim that the outdated Operations Specifications (“OpSpecs”) were on board the aircraft on September 8.[1]
The ALJ instead credited the testimony of FAA inspectors who were present during the ramp check and found that Boeta’s interactions with them demonstrated that he “did not know where the proper RVSM documentation was located because he had not checked on the RVSM compliance for his aircraft before the flight.” Although Boeta initially told the inspectors that his flight was conducted under 14 C.F.R. Part 91, he later insisted that he misspoke and that the flight was conducted under 14 C.F.R. Part 135.[2] This distinction is impor *649 tant, because, as Boeta later testified, he knew that if USAC did not dispatch a particular flight, the aircraft could not be flown under Part 135 in reliance upon USAC’s OpSpecs, which were the basis of the aircraft’s RVSM authorization. He also testified that he understood that the flight was not dispatched by or under the operational control of USAC.[3]
The ALJ credited additional testimony of Michael Ohannesian, one of the FAA Inspectors who examined the out-of-date USAC OpSpecs presented by Boeta on the day of the ramp check. Ohannesian testified that, by its terms, the OpSpecs were for the exclusive use of USAC and that the RVSM authorization could not be used unless USAC had operational control of the flight. In other words, according to the testimony heard by the ALJ, the OpSpecs relied upon by Boeta only authorized USAC to operate the aircraft in RVSM airspace, regardless of whether or not those OpSpecs were current or outdated. Importantly, the NTSB ultimately found that Boeta had reason to question whether the aircraft’s prior RVSM authorization was valid because he “was aware [that] USAC did not dispatch the flight and [that] the flight was not under the operational control of USAC.” Moreover, the ALJ credited FAA Inspector Charles McKinley’s testimony that the pilot in command is responsible for ensuring that all required documents are current before making a flight, which would include ensuring that RVSM authorization is current before making a flight in RVSM airspace.
These factual determinations are supported by “more than a scintilla” of relevant evidence such that “a reasonable mind might accept [the evidence] as adequate” to support the NTSB’s conclusion and thus satisfy the deferential “substantial evidence” standard. See Ellis v. Liberty Life Assur. Co. of Bos., 394 F.3d 262, 273 (5th Cir. 2004) (quoting Deters v. Sec’y of Health, Educ. & Welfare, 789 F.2d 1181, 1185 (5th Cir. 1986)). Further, these factual findings support the ALJ’s ultimate conclusion that Boeta’s violation was not inadvertent because the evidence established that he “did not determine if his aircraft was RVSM compliant before he flew in RVSM airspace, where jets fly at high speed at reduced vertical separation; he simply did not check.” The NTSB upheld the ALJ on these factual findings and likewise held that Boeta’s violation did not qualify as inadvertent, because he “chose not to check” the RVSM authorization before the September 8 flight, despite having good reason to question whether the RVSM authorization he relied upon was valid.
*650 Unlike the majority, I believe this NTSB conclusion is consistent with Ferguson v. National Transportation Safety Board, 678 F.2d 821 (9th Cir. 1982), in which the United States Court of Appeals for the Ninth Circuit defined an “inadvertent act” as “one that is not the result of a purposeful choice.” Id. at 828. One could reasonably conclude that Boeta’s failure to check on the RVSM status when he had good reason to question its validity for the September 8 flight is akin to the Ninth Circuit’s example of a “purposeful choice” to place a cup of coffee on a precarious table edge. Id. Likewise, Boeta’s choice not to cheek on the RVSM status at all may reasonably be viewed like the Ninth Circuit’s example of a pilot who flies at an incorrect altitude after choosing not to consult his instruments to verify his altitude. Id.
Moreover, the ALJ’s finding that the surrounding circumstances of the September 8 flight should have alerted Boeta that the flight was not RVSM authorized distinguishes the instant case from Administrator v. Meachum, NTSB Order No. EA-4633 (1998). In Meachum, the NTSB concluded that a pilot’s failure to check his aircraft’s fuel tanks prior to a flight was justified by the surrounding circumstances, which gave the pilot no reason to suspect that the fuel level was lower than he believed it to be.[4] Id. This is in contrast to the red flags found to exist in Boeta’s case. Again, Boeta was aware that USAC neither dispatched nor operated the September 8 flight, that USAC had not dispatched a Capital flight in six months, and that he was not permitted to conduct a flight under USAC’s Part 135 OpSpecs unless the flight was dispatched by USAC. Boeta was also aware that Capitol did not hold any form of RVSM authorization itself.
The NTSB’s interpretation is additionally consistent with its past decisions distinguishing a pilot “claim[ing] ignorance of the regulations” at the time of a violation from a pilot who was aware of the regulations at the time of the violation, but “believed, albeit mistakenly, that he was acting in compliance” with' them. See Administrator v. Halbert, NTSB Order No. EA-3628 (1992); Administrator v. McKenna, NTSB Order No. EA-3960 (1993). In these decisions, the NTSB clarified that the latter violation qualifies as inadvertent, but the former does not, because, while the pilot “did not purposefully violate the [Federal Aviation Regulations], neither did he make any attempt to comply[.]” McKenna, NTSB Order No. EA-3960, at *4. While the majority credits some of Boeta’s testimony to support his claim that he was aware of the requirements and merely mistakenly believed his September 8 flight was in compliance with them, the factfinder who heard Boeta’s testimony and cross-examination over the course of two days specifically discredited that testimony, and there was factual support in the record for the NTSB to infer instead an actual ignorance of the applicable regulations, and, as a result, no attempt on Boeta’s part to comply with those regulations. Specifically, Boeta testified, and the ALJ and NTSB found, that Boeta knew that USAC did not dispatch or operate the-September 8 flight. In fact, he was aware that *651 USAC had not dispatched a Capital flight in six months. These facts can reasonably be understood to demonstrate that, because he at no time questioned how USAC’s RVSM authorization could apply to a flight that USAC did not dispatch or operate, Boeta lacked an understanding of the requirements of 14 C.F.R. § 91.180 and 14 C.F.R. § 91, App. G, which are explicit that both the aircraft and the operator must be approved for RVSM authorization, rather than a mere mistaken belief that his September 8 flight somehow complied with those regulations. These facts also support the inference that Boeta was not familiar with the content of the OpSpecs upon which he purportedly relied, as those OpSpecs only provided for RVSM authorization if USAC had operational control of the flight.[5]
To summarize, yet I hope not to oversimplify, three factual points (none of which is disputed by the majority or Boe-ta) provide substantial evidence for the conclusion that Boeta’s actions did not qualify as inadvertent. First, Boeta testified that his mistaken belief that the September 8 flight had valid RVSM authorization was based on the out-of-date USAC OpSpecs that he presented to FAA inspectors following his September 8 flight. Second, those out-of-date OpSpecs provided that USAC’s RVSM authorization could not be used unless USAC had operational control of the flight, and Boeta knew that when USAC did not dispatch a flight, the aircraft could not be operated under Part 185. Finally, and most importantly, Boeta knew that USAC did not dispatch or have operational control of the September 8 flight, which he insisted to inspectors was conducted under Part 135. In fact, Boeta was well aware that USAC had not dispatched a single Capital flight in six months and had himself flown flights for Capital in the interim. Based on these facts alone, substantial evidence supported the finding that Boeta ignored surrounding circumstances of the invalidity of the flight’s RVSM authorization, which the relevant Federal Aviation Regulations make clear is operator-specific. Under this reasonable view of the record, read in light of the precedent discussed above, it was not arbitrary and capricious to conclude that Boeta’s violation did not qualify as inadvertent and that a waiver of violation was therefore not justified. Hence, I would AFFIRM the NTSB’s order in its entirety.

. There is a "very narrow window of appellate scrutiny” for an AU’s credibility assessment. Miranda, 866 F.2d at 807. "[A] determination of credibility is non-reviewable unless there is uncontrovertible documentary evidence or physical fact which contradicts it.” Id. (quoting N.L.R.B. v. J.M. Machinery Corp., 410 F.2d 587, 590 (5th Cir. 1969)).

. As the majority discusses, flights operated under Part 135 are commercial in nature, *649 while flights operated under Part 91 are noncommercial and are operated by the owner or lessee. Although the record reflects some contradiction regarding whether Boeta actually believed the September 8 flight was operated under Part 135 or Part 91, he indicated in his response to the FAA's letter of investigation that the flight was operated under Part 135. Regardless, the ALJ credited testimony that both Part 91 and Part 135 flights conducted under USAC's Part 135 certificate would be required to be dispatched and operated by USAC.

. The majority questions how Boeta coüld have known that the aircraft was not under the operational control of USAC. However, Boeta himself testified that the aircraft was under the operational control of Redi-Carpet, not USAC. See Huerta v. Boeta, NTSB-ALJ Order No. SE-19349, at 442. Additionally, the ALJ credited testimony that Boeta received training regarding operational control of the aircraft and the importance of the aircraft being dispatched by USAC, regardless of whether the flight was conducted under Part 91 or Part 135. Id at 429, 433. Moreover, the majority acknowledges that, according to Boeta’s own testimony, he knew the September 8 dispatch sheet did not come from USAC. This confirmed that the flight was not under USAC’s operational control.

. The circumstances in Meachum were highly unusual. In that case, the pilot had been the last person to fuel the aircraft, knew how much fuel he had put in, knew how long he had flown the aircraft, and knew that the left fuel gauge was not working properly. Mea-chum, NTSB Order No. EA-4633, at *1. The NTSB also suggested that the reason the fuel was low might have been because someone siphoned it, a possibility that understandably might not occur to a pilot. Id. at *2.

. Although the majority focuses on whether USAC and Capital provided Boeta with notice that their relationship had ended and that, as a result, the aircraft was no longer listed on USAC’s OpSpecs, The question of inadvertence does not require us to make our own findings of fact on that point. Nor is it necessary for us to determine, based on our own judgment, whether a pilot should be expected to verify that valid RVSM authorization documents are on board every flight even if the pilot has no reason to suspect that prior RVSM authorization may no longer be valid. Regardless, the ALJ credited testimony from both a USAC employee and a Capitol employee indicating that pilots at Capital knew that the relationship between the two companies had ceased to exist, and I would defer to the ALJ’s determinations of witness credibility. The ALJ additionally credited FAA testimony that pilots flying in RVSM airspace must check RVSM documents to confirm they are up-to-date and on board a flight. On that point in particular, we should defer to the ALJ's determination of witness credibility, because pilot safety is of such complexity and importance.